[Civ. No. 40917. First Dist., Div. Two. July 25, 1979.]

WILLIAM M. CAVERS, Plaintiff and Appellant, v.
CUSHMAN MOTOR SALES, INC., et al.,
Defendants and Respondents.

## Counsel

McGuinn & Moore, Lewton, McGuinn & Moore and Bruce S. Osterman for Plaintiff and Appellant.

Thomas F. Nelson, Smith & Lamoreaux, Robert J. Smith and Phillip G. Svalya for Defendants and Respondents.

## Opinion

**SABRAW, J.**\*—In April 1973 plaintiff William M. Cavers was injured while riding on a motorized golf cart at the Oakridge Golf Club in San Jose. Cavers instituted the present tort action claiming that the manufacturer and the lessor should be held accountable under strict products liability because of their failure to give warning of the golf cart's propensity to tip over while turning. The primary issue is whether the trial judge correctly instructed the jury that a product otherwise properly designed and manufactured could nevertheless be "defective" if no warning was given and the absence of the warning rendered the product "substantially dangerous" to the user. We conclude that the trial court did not err in its instruction, and further take this opportunity to frame some

---

*Assigned by the Chairperson of the Judicial Council.

guidelines for use in formulating jury instructions for defining "defect" in "failure to warn" cases. In doing so, we draw analogy to the pronouncements of the Supreme Court in *Barker* v. *Lull Engineering Co.* (1978) 20 Cal.3d 413 [143 Cal.Rptr. 225, 573 P.2d 443], on "design defect" instructions.

## I. STATEMENT OF FACTS

On April 26, 1973, appellant was assisting in coordinating activities on behalf of his employer, General Adjustment Bureau, at an independent insurance agents' golf tournament at the Oakridge Golf Club in San Jose. A motorized golf cart was rented from the club's pro shop. No manual or instruction was furnished with the cart and appellant did not request any. Appellant's experience with carts consisted of having driven and ridden as a passenger on one or two previous occasions.

During the course of the afternoon, appellant proceeded with his duties, driving around the golf course and dispensing refreshments to the tournament participants. In addition, appellant gave rides to numerous persons to and from various points in the country club. Appellant made the acquaintance of one Meredith Daniel when she asked him to give her a ride to the club house. Late in the afternoon, Daniel asked appellant if she could drive the cart. Appellant consented and offered her simple instructions on shifting to forward and reverse. At the conclusion of the day, appellant and Daniel stopped at the club house for drinks and then headed toward the parking lot to return a drum used for soft drinks to his sales manager's car. As Daniel drove the cart down one aisle of cars, appellant pointed out the car off to the left. Daniel then made a left turn to go down the proper aisle. As she made the turn, appellant began to feel the left side of the cart tip. He therefore spread his right leg out in order to brace himself against the perceived tipping. There was conflicting testimony on whether the cart actually tipped and on the speed it was moving at the time of the turn.[1] Appellant indicated he was in pain and was eventually taken to the hospital. Appellant testified that his injury required surgery and caused him to alter his lifestyle.

[1] On direct examination, appellant stated flatly: "It [the golf cart] tipped and threw me out." On cross-examination, however, he indicated that he voluntarily thrust his leg out "because I didn't want it to tip and land on top." Both Daniel and an eyewitness to the accident testified that the cart did not tip.

Appellant also maintained that the cart was traveling at 10-15 miles per hour at the time of the turn. Yet the project engineer for respondent Cushman Motor Sales testified that the maximum speed of the vehicle was 11-12 miles per hour and appellant admitted that the cart had never been traveling at maximum speed at any time during the afternoon. Daniel estimated the cart's speed as "one or two miles an hour."

On November 14, 1973, appellant filed a complaint against Meredith Daniel, her employer, Oakridge Golf Club, and Cushman Motor Sales, alleging negligence on the part of all respondents and strict products liability against Cushman (the manufacturer) and Oakridge (the lessor) for defects in the golf cart.

The case was tried before a jury which returned with a special verdict in favor of all respondents. Plaintiff-appellant has appealed from the judgment entered on the special verdict.

II. The Trial Court Correctly Instructed the Jury on the Definition of "Defect" for Failure to Warn Under Strict Products Liability

Appellant's sole theory of recovery was strict liability in tort for failure to warn of the golf cart's propensity to tip while turning. He presented no evidence that the golf cart was defective in either its design or its manufacture.

Appellant claims the trial court committed error in the following instruction which it gave to the jury: "An article otherwise appropriately made and maintained is defective within the meaning of the instruction which I have just given if the manufacturer and/or lessor fails to adequately warn of dangerous propensities of such article which in the absence of an adequate warning renders the article *substantially dangerous* to the user." (Italics added.)

The appellant contends that the trial court's use of the adverb "substantially" to modify the term "dangerous" is contrary to California law and prejudicially increased the appellant's burden of proof.

Prior to the California Supreme Court decision in *Cronin* v. *J.B.E. Olson Corp.* (1972) 8 Cal.3d 121 [104 Cal.Rptr. 433, 501 P.2d 1153], the cases involving products liability actions required that a two-pronged test be met to establish liability. The claimant was required to prove (1) "a defective condition" and also that the defect was (2) "unreasonably dangerous." In 1972, in a case involving a products liability action based on "manufacturing defects," the Supreme Court in *Cronin* eliminated the plaintiff's burden of having to establish that a proven defect was also "unreasonably dangerous."

The appellant argues in the instant case that the prohibition of *Cronin* against the use of the term "unreasonably dangerous" applies with equal force to the failure to warn cases and that the term "substantially dangerous" is the equivalent term and is equally defective.

We conclude that the *Cronin* decision, while eliminating in the manufacturing defect cases the previous dual burden of proving both the existence of a defect and an unreasonable degree of danger resulting therefrom, nevertheless did not preclude weighing the degree of dangerousness in the failure to warn cases.

The landmark case in strict products liability is *Greenman* v. *Yuba Power Products, Inc.* (1963) 59 Cal.2d 57 [27 Cal.Rptr. 697, 377 P.2d 897, 13 A.L.R.3d 1049], where the California Supreme Court announced the rule that ". . . A manufacturer is strictly liable in tort when an article he places on the market, knowing that it is to be used without inspection for defects, proves to have a defect that causes injury to a human being." (*Id.*, at p. 62.)

It was soon recognized that the *Greenman* doctrine was applicable to both (a) a defect in manufacture and (b) a defect in design. (59 Cal.2d at p. 64, see also *Pike* v. *Frank G. Hough Co.* (1970) 2 Cal.3d 465, 475 [85 Cal.Rptr. 629, 467 P.2d 229].) However, beginning with the case of *Canifax* v. *Hercules Powder Co.* (1965) 237 Cal.App.2d 44 [46 Cal.Rptr. 552], California courts determined that ". . . a product, *although faultlessly made,* may nevertheless be deemed 'defective' . . . and subject the supplier thereof to strict liability if it is unreasonably dangerous to place the product in the hands of a user without a suitable warning and the product is supplied and no warning is given." (237 Cal.App.2d at p. 53, italics added; see also Rest.2d Torts, § 402A com. j., *Barth* v. *B.F. Goodrich Tire Co.* (1968) 265 Cal.App.2d 228, 244-245 [71 Cal.Rptr. 306].) Thus, a third type of defect was recognized, which consisted not in the manufacturer's workmanship or his choice of design, but in a product whose absence of a warning created unreasonable risks to the consumer.

In the meantime, the formulation of strict products liability propounded by the Restatement Second of Torts section 402A, began to exert a pervasive influence on decisional law. Its requirement that the consumer prove "a defective condition" which was *also* "unreasonably dangerous," although significantly adding to the plaintiff's burden as set forth in *Greenman,* was adopted in both Court of Appeal and Supreme Court decisions. (See e.g. *Jiminez* v. *Sears, Roebuck & Co.* (1971) 4 Cal.3d 379,

383-384 [93 Cal.Rptr. 769, 482 P.2d 681, 52 A.L.R.3d 92]; *Pike* v. *Frank G. Hough Co., supra,* 2 Cal.3d 465, 475; *Putensen* v. *Clay Adams, Inc.* (1970) 12 Cal.App.3d 1062, 1072 [91 Cal.Rptr. 319].)

In *Cronin* v. *J.B.E. Olson Corp., supra,* 8 Cal.3d 121, the Supreme Court concluded that the added requirement that a defect makes the product "unreasonably dangerous," which had "crept into our jurisprudence without fanfare after its inclusion in section 402A of the Restatement Second of Torts," represented "a step backward in the area" pioneered by the *Greenman* decision, and should be rejected. (*Id.,* at pp. 129, 133.) *Cronin* reached this result out of two principal concerns: (1) requiring a plaintiff to prove *both* a defect and that the defect was unreasonably dangerous imposes a double burden on the consumer, adding an element "which rings of negligence" and which in practice rarely leads to a different result than would have been reached under negligence law (*id.* at pp. 132-133); and (2) such a requirement would permit the manufacturer to escape liability simply because of the low expectation the ordinary consumer might have for his product. (*Id.,* at p. 133.) The court concluded that to recover on a strict liability theory, the plaintiff need only prove that the product was defective and that the defect was a proximate cause of his injuries, as set forth in *Greenman.* Moreover, "We can see no difficulty in applying the *Greenman* formulation to the full range of products liability situations, including those involving 'design defects.' " (*Cronin, supra,* 8 Cal.3d at p. 134.)

At this juncture, it is important to note what the Supreme Court did and did not do in its *Cronin* decision. It did abolish the Restatement's requirement that the product prove not only defective but also "unreasonably dangerous" as a result thereof. It also clearly indicated that the latter requirement should be done away with in both manufacturing defect and design defect situations. It did not, however, overrule or disapprove of any prior cases which gave meaning to the word "defect." On the contrary, the court acknowledged "the difficulties inherent in giving content to the defectiveness standard" and referred the courts of this state to "a cluster of useful precedents" in the area. (*Id.,* at p. 134, fn. 16, quoting from Traynor, *The Ways and Meanings of Defective Products and Strict Liability* (1965) 32 Tenn.L.Rev. 363, 373.) It did not therefore alter the standard for defectiveness set forth in *Canifax,* i.e., that a product otherwise free of defects in manufacture and design *may become defective* if it is "unreasonably dangerous to place [it] in the hands of the user without a suitable warning. . . ." (237 Cal.App.2d at p. 53.)

The foregoing interpretation was borne out by the subsequent Court of Appeal case of *Dosier* v. *Wilcox-Crittendon Co.* (1975) 45 Cal.App.3d 74 [119 Cal.Rptr. 135], the only reported appellate decision which squarely dealt with the effect of *Cronin* on failure to warn cases. Although the court also based its decision upon the doctrine of invited error, it stated its understanding that *Cronin* did not overrule the *Canifax* doctrine establishing liability for faultlessly made products only if they are "unreasonably dangerous" because of the absence of a warning. (*Id.,* at p. 80.) In a footnote, the court noted that *Canifax* actually *extended* the parameters of strict products liability beyond the scope of *Greenman,* which was expressly confined to defects in design or manufacture. (*Id.,* at pp. 80-81, fn. 3, citing *Cronin* v. *J.B.E. Olson, supra,* 8 Cal.3d at p. 134.) Thus, as *Dosier* perceptively points out, "[t]he inclusion of the element of 'unreasonably dangerous' when applied to a duty to warn is entirely different than when applied to a defect in design or manufacture." (45 Cal.App.3d at p. 81, fn. 3.)

Other Court of Appeal decisions postdating *Cronin* do not directly face the issue and moreover provide no clear consistent pattern: two cases faithfully repeat the *Canifax* formula of "unreasonably dangerous" for failure to warn liability (*Bojorquez* v. *House of Toys, Inc.* (1976) 62 Cal.App.3d 930, 933 [133 Cal.Rptr. 483]; *Burke* v. *Almaden Vineyards, Inc.* (1978) 86 Cal.App.3d 768, 772 [150 Cal.Rptr. 419]); one case repeats the formula without the word "unreasonably," yet cites *Dosier* as authority for the proposition (*Dimond* v. *Caterpillar Tractor Co.* (1976) 65 Cal.App.3d 173, 181, fn. 6 [134 Cal.Rptr. 895]); and a fourth avoids discussing degrees of danger, but addresses itself only to the specialized situation where the product requires assembly and use in conformity with the supplier's directions and such directions are the unsophisticated consumer's only guide and means of avoiding physical injury. (*Midgley* v. *S.S. Kresge Co.* (1976) 55 Cal.App.3d 67, 74 [127 Cal.Rptr. 217].)

The problem, of course, is that no precise or easily adaptable definition of "defect" can be found. (See *Jiminez* v. *Sears, Roebuck & Co.* (1971) 4 Cal.3d 379, 383 [93 Cal.Rptr. 769, 482 P.2d 681, 52 A.L.R.3d 92].) Indeed, the lack of "definitive precedent" on the concept of defect has caused the Committee on Standard Jury Instructions to avoid issuing jury instructions defining either "defect" or "defective condition." (BAJI No. 9.00 (1977 ed.) com., p. 289.)

Fortunately, the Supreme Court has provided us with further guidance through its recent decision in *Barker* v. *Lull Engineering Co.* (1978) 20

Cal.3d 413 [143 Cal.Rptr. 225, 573 P.2d 443]. In *Barker*, plaintiff used the failure to warn as one of his theories of recovery but did not raise any issue relating thereto on appeal (*id.* at p. 420, fn. 1), challenging instead an instruction on design defect which required a finding that " 'the product was unreasonably dangerous for its intended use . . .' " (*id.* at p. 422, fn. 4). In reversing, the court reaffirmed its holding in *Cronin* that the "unreasonably dangerous" terminology should not be utilized in either design or manufacturing instructions on defect. Yet the court recognized the very real need for " 'giving content to the defectiveness standard' " (*id.* at p. 428) and the danger of telling the jury that the plaintiff may recover for injury caused by "defects" without defining for them the meaning of the term: "Commentators have pointed out that in view of the diversity of product deficiencies to which the defect rubric has been applied, an instruction which requires a plaintiff to prove the existence of a product defect, but which fails to elaborate on the meaning of defect in a particular context, may in some situations prove more misleading than helpful. As Professor Wade has written: '[The] natural application [of the term "defective"] would be limited to the situation in which something went wrong in the manufacturing process, so that the article was defective in the sense that the manufacturer had not intended it to be in that condition. To apply [the term "defective"] also to the case in which *a warning is not attached* to the chattel or the design turns out to be a bad one or the product is likely to be injurious in its normal condition . . . [and] [t]o use it without defining it to the jury is almost to ensure that they will be misled.' (Wade, *On the Nature of Strict Tort Liability for Products, supra,* 44 Miss.L.J. 825, 831-832 (fns. omitted). . . ." (20 Cal.3d at p. 428; italics added.)

The classification drawn between manufacturing defects on the one hand and defects caused by poor design or failure to warn on the other is of particular significance, for the court goes on to state that the likelihood of confusion is substantially more acute where the defect is in design rather than manufacture: ". . . a manufacturing defect is readily identifiable because a defective product is one that differs from the manufacturer's intended result or from other ostensibly identical units of the same product line. . . . A design defect, by contrast, cannot be identified simply by comparing the injury-producing product with the manufacturer's plans or with other units of the same product line, since by definition the plans and all such units will reflect the same design." (20 Cal.3d at p. 429.)

If the concept of defect "raises considerably more difficulties" in the design context than in the manufacturing or production context (*id.* at

p. 429), it becomes all the more elusive when applied to failure to warn cases. Here the jury cannot compare the product with other units off the same assembly line, nor can they at least weigh the reasonableness of the design against alternative designs presented by the plaintiff (see *Baker* v. *Chrysler Corp.* (1976) 55 Cal.App.3d 710, 716 [127 Cal.Rptr. 745]). Instead, they must decide whether a product flawlessly designed and produced may nevertheless possess such risks to the user without a suitable warning that it becomes "defective" simply by the absence of a warning. Therefore, the *Barker* court's pronouncements on acceptable methods of instruction in defining "design" defects are especially enlightening.

In the first place, the court in *Barker* held that "[*a*] *trial court may properly formulate instructions to elucidate the 'defect' concept in varying circumstances."* (*Barker* v. *Lull Engineering Co., supra,* 20 Cal.3d at p. 426, italics original.) The court continued further to explain that *Cronin* was never meant to "preclude a trial court from framing a definition of defect, appropriate to the circumstances of a particular case, to guide the jury as to the standard to be applied in determining whether a product is defective or not." (*Id.,* at p. 427.)

Although a standard which has as its touchstone "ordinary consumer expectations as to safety" is frequently useful, the Supreme Court noted that this concept is often out of place in design defect situations, for " 'the consumer would not know what to expect, because he would have no idea how safe the product could be made.' " (20 Cal.3d at p. 430, quoting from Wade, *op. cit. supra.*) Thus, the court noted that numerous California decisions have implicitly held that a defect in design may exist where, despite meeting ordinary consumer expectations, the product's design is found by the jury to have embodied "excessive preventable danger," "or in other words . . . the jury finds that the risk of danger inherent in the challenged design outweighs the benefits of such design." Pursuant to this standard, ". . . a jury may consider, among other relevant factors, the gravity of the danger posed by the challenged design, the likelihood that such danger would occur, the mechanical feasibility of a safer alternative design, the financial cost of an improved design, and the adverse consequences to the product and to the consumer that would result from an alternative design. [Citations.]" (*Barker, supra,* 20 Cal.3d at p. 431.)

■ We believe the foregoing principles to be adaptable to a failure to warn case. In assisting the jury's determination of whether the absence of

a warning makes a product defective, the trial court should focus their attention on such relevant considerations as the normal expectations of the consumer as to how the product will perform, degrees of simplicity or complication in the operation or use of the product, the nature and magnitude of the danger to which the user is exposed, the likelihood of injury, and the feasibility and beneficial effect of including a warning. (Cf. *Canifax* v. *Hercules Powder Co., supra,* 237 Cal.App.2d 44; *Barth* v. *B.F. Goodrich Tire Co., supra,* 265 Cal.App.2d 228, 244-245; *Bojorquez* v. *House of Toys, Inc., supra,* 62 Cal.App.3d 930, 933-934; *Burke* v. *Almaden Vineyards, Inc., supra,* 86 Cal.App.3d 768, 772-773.)

We disagree with appellant's assertion that he was entitled to an instruction which eliminated from jury consideration all references to degrees of danger.[2] First of all, the Supreme Court in *Cronin* recognized that the words "*unreasonably* dangerous" were inserted by the Restatement in order to prevent the seller "from being treated as an insurer of its products," in manufacturing and design defect cases; the court determined that these words could nevertheless be eliminated because "such protective end is attained by the necessity of proving that there was a defect in the manufacture or design of the product and that such defect was a proximate cause of the injuries." Where, as here, plaintiff is relieved of the burden of proving either a defect in manufacture *or* design, permitting recovery upon proof that the product was merely "dangerous" would in fact turn every manufacturer into an insurer as long as plaintiff could show (a) that the product contained no warning and (b) that he was injured while using it. Why else was the plaintiff injured, a jury would reasonably ask itself, unless the product was "dangerous"? ■ Thus, as one commentator has aptly observed, "Since the use of almost any product involves some degree of danger, the duty of a manufacturer to warn of danger must be related, or made dependent upon, the degree of danger involved in the use of the product." (Annot., Failure to Warn as Basis of Liability Under Doctrine of Strict Liability in Tort (1973) 53 A.L.R.3d 239, 251.)

Elimination of any consideration of degrees of danger is also contrary to the principles articulated by the Supreme Court in *Barker,* i.e. that the

[2]Appellant offered the following two instructions, which he claims were improperly rejected by the trial court: ". . . [A] product, though faultlessly made, may nevertheless be deemed 'defective' . . . (in terms of strict liability) and subject the supplier thereof to strict liability if it is dangerous to place the product in the hands of the user without a suitable warning and the product is supplied and no warning is given."

"A product is also defective if the supplier fails to adequately warn of dangerous conditions or propensities which in the absence of an adequate warning make the product dangerous to the user."

concept of *"excessive* preventable danger" and the balancing of risks must be employed where the term "defect" does not easily lend itself to definition. Just as the Supreme Court has concluded that "an instruction [on design defect] which appears to preclude such a weighing process under all circumstances may mislead the jury" (*Barker, supra,* 20 Cal.3d at p. 434), we too recognize that a failure to warn instruction which predicates liability on a finding of "danger," without regard for degree or without consideration of the relevant factors mentioned previously, does not accurately reflect existing case precedent.

We now turn to the instructions on defect for failure to warn given by the trial court. We feel that the court wisely chose to omit the word "unreasonably" from the original *Canifax* formulation, since the Supreme Court has indicated that the word improperly "introduces an element which 'rings of negligence' " in a strict liability case (*Barker, supra,* 20 Cal.3d at p. 433, citing *Cronin, supra,* 8 Cal.3d at p. 132) and may tend to divert the jury's attention from the condition of the product to the conduct of the seller. Instead, the trial court told the jurors that an otherwise faultlessly made article may be deemed defective if the manufacturer/lessor fails to warn of dangerous propensities ". . . which in the absence of an adequate warning render the article *substantially* dangerous to the user." (Italics added.) By using the modifying adverb "substantially," the court appropriately indicated that a weighing of degrees of danger was necessarily involved in determining the existence of a defect.[3] But the court did not end its instruction here. It went on to give the jury detailed guidance on what was meant by a "substantial danger": "The term substantial danger as used in these instructions does not mean any danger, however remote, or a trivial danger nor conversely is the term synonymous with great or extreme danger. A substantial danger does not fall precisely in any specific area in the spectrum of danger. The term substantial danger means danger which is real and not insignificant. The word danger is to some extent self defining when one considers its antonym insubstantial. Whether a danger is substantial or insubstantial must be determined from the evidence and measured in the light of several criteria none of which is totally controlling including the potential injurious consequences of such danger, the likelihood that injury might result, the quality and extent of danger to which the user is exposed, and whether a danger is latent or patent (patent means apparent and latent is its antonym)."

---

[3]The court's use of this word in conjunction with products which contain no manufacturing or design defect showed a significant parallel to the Supreme Court's thinking in *Barker,* for at footnote 10 the court states: "In the instant case we have no

Thus, when the instructions on the definition of "defect" are viewed as a whole, it is evident that they adequately focused the jury's attention upon the relevant factors which must be considered in determining whether the magnitude of the danger inherent in the use of a product was sufficiently great as to require a warning. We therefore cannot conclude that the jury were misled or confused as a result of the instructions given. (See 4 Witkin, Cal. Procedure (2d ed.) Trial, § 193, p. 3013; *Chandler* v. *Benafel* (1934) 3 Cal.App.2d 368, 371 [39 P.2d 890].) Prejudice has not been shown.

### III. ■ THE TRIAL COURT DID NOT ABUSE ITS DISCRETION IN EXCLUDING EXPERT OPINION

Appellant called Dr. Henry Hahne, a mechanical engineer, as an expert to testify as to the tipping propensities of the golf cart. Hahne stated that, as a result of his observations and experiments with golf carts such as the one appellant was using he found that the cart would "readily" tip on sharp turns. He was then asked whether he considered this characteristic to be "dangerous." Counsel for respondent Cushman immediately objected. The court took the matter under consideration and finally issued the following ruling: ". . . I conclude that danger is measured not only by the potential consequence of a given propensity in an article [but] by several other factors, including but not limited to the frequency of harm anticipated as a consequence of such propensity, the foreseeability of such propensity to the user, the awareness of such propensity by the user, to the end that he may guard himself against such propensity, and the extent and quality of detriment anticipated."

The court went on to state that while Dr. Hahne could speak "to the consequence of the propensity asserted" and "to what may reasonably occur as a result of the propensity asserted from a physical and engineering standpoint," there was an insufficient foundation for him to opine that such propensity was dangerous.

■ We start with the general principle that the competency and qualification of an expert to give his opinion is within the sound discretion of the trial judge. On appeal, that determination will not be disturbed unless a manifest abuse of discretion is shown. (*Huffman* v. *Lindquist* (1951) 37 Cal.2d 465, 476 [234 P.2d 34, 29 A.L.R.2d 485].)

occasion to determine whether a product which entails a *substantial risk of harm* may be found defective even if no safer alternative design is feasible." (20 Cal.3d at p.430, italics added.)

■ Appellant bases his argument on the assumption that Dr. Hahne's opinion as to dangerousness was excluded because it went to an "ultimate fact" in the case. But the record discloses that it is clear that the court's decision was grounded upon the failure of appellant's counsel to lay an adequate foundation as to anything other than the propensities of the golf cart from an engineering standpoint. Thus, the court acted well within its discretion in refusing to permit Hahne to offer an opinion as to its dangerousness.

The ruling was not erroneous.

Judgment is affirmed.

Taylor, P. J., and Rouse, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied September 20, 1979.