[No. B206763. Second Dist., Div. One. Aug. 27, 2010.]

DONNA SALLER, Individually and as Personal Representative, etc., et al., Plaintiffs and Appellants, v.
CROWN CORK & SEAL COMPANY, INC., Defendant and Respondent.

COUNSEL

Waters Kraus & Paul, Paul C. Cook and Michael B. Gurien for Plaintiffs and Appellants.

Morris Polich & Purdy, Douglas C. Purdy, Richard H. Nakamura, Jr., Dean A. Olson, Joni Lynn Loomis, Heather L. Blume; Armstrong & Associates and William H. Armstrong for Defendant and Respondent.

OPINION

**JOHNSON, J.**—Plaintiffs appeal from a judgment in favor of defendants Bondex International, Inc. (Bondex),[1] RPM, Inc., and Crown Cork & Seal Company, Inc. (Crown), in their action for wrongful death. Plaintiffs' decedent William Saller died of mesothelioma, an asbestos-related disease, in February 2006. Mr. Saller asserted two sources of exposure to asbestos: his employment at Standard Oil where he was exposed to pipe insulation containing asbestos manufactured by Crown, and his personal use of joint compound manufactured by Bondex for home repair. At trial, the court refused to give plaintiffs' requested jury instructions on the consumer expectations test and failure to warn. We reverse.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

### A. *Background Facts*

William Saller was diagnosed with mesothelioma in June 2005, and died in 2006.[2] Mr. Saller was born in 1937, and joined the Marines in 1954. In August 1959, he went to work for Standard Oil at its El Segundo refinery. He worked there for seven and a half years, and worked for the Los Angeles County Sanitation District from 1967 until 1993. Although Saller did not work with asbestos-containing products at his employment, he worked in close proximity with those who did.

In June 2005 he began to experience shortness of breath, and pain in his left arm and elbow. He went to his family doctor, believing he was having

---

[1] Bondex, now known as Specialty Products Holding Corp., and RPM, Inc., filed for chapter 11 bankruptcy in the United States Bankruptcy Court for the District of Delaware. Pursuant to 11 United States Code section 362(a)(1), the appeal was stayed against Bondex and RPM, Inc. On June 18, 2010, we issued an order that the appeal remained pending with respect to Crown.

[2] Saller died prior to trial. His videotaped deposition was played for the jury.

heart problems. Saller had a CAT scan, which disclosed fluid in his lungs. He underwent a lung biopsy and was diagnosed with mesothelioma. A doctor at UCLA (University of California, Los Angeles) told Saller he was a good candidate for lung surgery because he was in otherwise good health. In September 2005, doctors removed a large tumor from his lungs. After his surgery, Saller had radiation treatment, which he completed in December 2005.

Saller believed he was exposed to asbestos when he worked at Standard Oil and from his use of home repair products containing asbestos.[3]

### 1. *Saller's Work at Standard Oil, 1959–1967*

Saller believed he was exposed to asbestos in three different locations at Standard Oil: the barrel reconditioning plant, the filling plant, and the warehouse. When Saller went to work at Standard Oil in 1959, Saller was assigned to the barrel reconditioning plant, where they would clean and paint used oil barrels for reuse. They would use caustic solution to remove the old paint from the barrel, and then they would steam clean the barrels. The work was very hot and dirty. After the barrels were cleaned, Saller would work on removing excess moisture, rust and dents from the barrels. There were steam pipes running through the barrel reconditioning plant. He worked in barrel reconditioning for about five months.

Saller then went to work in the filling plant. The filling plant was not as dirty as the barrel reconditioning plant, but there was a "lot of oil around," and pipes and manifolds "running everyplace." Oil running through the pipes had to be heated to keep it flowing. The filling plant was very old, and parts of it had been built before 1920. He was in the filling plant about 18 months, and after that worked in the warehouse, where he worked a forklift to load products on trucks or railroad cars. Even while at the warehouse, he went to the filling plant several times a day to pick up items. Saller worked in the warehouse about five and a half years.

Saller believed he was exposed to asbestos during the time he worked in the warehouse because asbestos was contained in pipe coverings, which is insulation wrapped around a pipe to keep the heat in. He recalled that "Mundet" was a brand name on the insulation, and remembered it because it

---

[3] Saller's claim against Bondex was based upon his use of Bondex's asbestos-containing drywall joint compound, which he used to do home repair. As a result of Bondex's chapter 11 bankruptcy proceedings, we have stayed the appeal as to Bondex. We therefore decline to address the facts relating to Saller's claim against Bondex, or the merits of the appeal relating to Bondex because to do so would be to render an advisory opinion. (See *Branick v. Downey Savings & Loan Assn.* (2006) 39 Cal.4th 235, 243 [46 Cal.Rptr.3d 66, 138 P.3d 214].)

came in a package with a bright yellow "M" on it.[4] Mundet Corporation, which was acquired by Crown in 1966, manufactured asbestos-containing insulation products during the early 1960's, and sold its insulation to oil refineries.

Saller did not work personally with pipe covering, but observed other workers use it in the barrel reconditioning plant and in the filling plant. He saw other workers applying the Mundet insulation to pipes, and also saw them applying it to pumps and valves. About once a week he was 10 feet or less from where Mundet insulation was being applied in the barrel reconditioning plant, and in the filling plant he was closer than 10 feet from the insulation more than once a week.

During installation of the asbestos insulation, workers often cut the pipe covering to fit the pipes, pumps and valves. They would use a saw, utility knife or a power tool with a brush which would create a gray dust. Chunks and scraps of insulation and powder would be on the floor after the installation procedure, and there would be a lot of dust. At times, Saller would clean up the debris using a broom and shovel. Sometimes it took half an hour to clean up. Workers cut the pipe insulation about once at week in the barrel reconditioning plant, and several times a week in the filling plant. Saller believed he inhaled the dust because he would have particles on his face and back that were like "itchy powder." He did not wear any breathing protection; none was offered and he did not ask for any. In addition, workers in the barrel reconditioning plant would make a "mud" from a dusty powder and water that they would place around the valves. When they poured the powder into a bucket to mix it with water, it created a lot of dust.

During the time he worked at Standard Oil, Saller never received any warning about health risks associated with Mundet pipe insulation.

### 2. Saller's Complaint and Operative Second Amended Complaint

On November 1, 2005, Saller and his wife Donna Saller filed a complaint for personal injuries based upon Saller's exposure to asbestos-containing products manufactured by Crown and 18 other defendants, including Bondex. After Mr. Saller's death, on July 19, 2006, Donna Saller, individually and as representative of Saller's estate, and his daughters Lori Saller and Shari Jocis filed the operative second amended complaint alleging claims for wrongful death based on theories of negligence, strict liability, false representation, and intentional failure to warn.

---

[4] Saller was colorblind and nearsighted.

## B. *Trial, Jury Instructions, Jury Verdict*

Trial commenced on December 4, 2007, against defendants Crown, Bondex and RPM, Inc.

Robert Cameron, M.D., who performed plaintiff's September 2005 surgery, testified that mesothelioma is a tumor that grows in the space around the lungs, and is very diffuse. It is difficult to treat and there is no cure. Mesothelioma is caused by asbestos exposure, and exposure to asbestos caused Mr. Saller's disease. Barry Horn, M.D., who is board certified in pulmonary diseases, testified that with asbestos, it can be decades between exposure and the development of disease. Mesothelioma is a rare disease; there are only 3,000 cases per year in the United States, and in his opinion, plaintiff's disease was caused by exposure to asbestos. Arnold R. Brody, a cell biologist, testified that there is no safe level of asbestos exposure. Smoking does not cause mesothelioma and an individual may have genetic susceptibility to mesothelioma.

Susan Raterman, a certified industrial hygienist,[5] testified that asbestos fibers are small and invisible when airborne. It is difficult to ascertain the level of asbestos in the air and scientists rely on the asbestos content of materials to determine airborne content. A person can be exposed to asbestos without knowing it because the fibers are so small. According to Raterman, asbestos is a toxin and a carcinogen, and in an industrial setting, there is no safe dose of asbestos. Products that incorporate asbestos release asbestos into the air if they are handled in a manner that disturbs them because this causes the asbestos to become airborne.

Raterman opined that at Standard Oil, Saller was exposed to oil lines, steam lines, pipe manifolds, valves, pumps, and other equipment that was used to package oil products. From time to time, insulation was removed in his presence. In the barrel reconditioning area and the filling area where he worked, the insulation material and gasketing material more likely than not would have contained asbestos. In her opinion, if Saller was present where asbestos insulation was being sawed during the cleanup of insulation and gaskets, it would have exposed him to substantial amounts of asbestos. The type of asbestos products used in the 1960's was approximately 15 to 90 percent asbestos. She believed that exposure above the normal background level contributed to Saller's mesothelioma. In her opinion, appropriate warnings were not given regarding insulation in light of the knowledge of the dangers of asbestos at the time.

---

[5] An industrial hygienist is skilled in the art and science of recognizing, anticipating, evaluating and controlling health hazards in the workplace.

John Spence set up the industrial hygiene department at Standard Oil in 1959. In the 1950's, asbestos dust was regarded as a "nuisance"; however, by 1955, Standard Oil's safety engineers recommended respirators.

At trial, expert testimony established that sometime between the 1920's and 1960's, the scientific community became aware that asbestos was dangerous. In the 1930's, it was known that workers exposed to asbestos developed asbestosis. The Merewether and Price 1930 study set forth known risks associated with asbestos exposure. In the 1940's, studies of shipyards showed that insulators putting in insulation on pipes and boilers had less exposure than factory workers, and relatively low levels of disease. However, in the late 1940's, asbestos began to be associated with an increased risk of lung cancer.

Experts testified that by the 1950's, epidemiological evidence associated asbestos exposure with lung cancer, and by 1960 asbestos exposure had been linked to mesothelioma. Dr. Wagner's study in 1960 was the first that showed a connection with asbestos exposure and mesothelioma. In the 1960's, doctors discovered pipe insulators in shipyards had started getting asbestos-related diseases because they were exposed for longer periods of time than wartime workers had been. After 1964, exposure to asbestos could not be justified, and it was well known by the 1970's that asbestos was a health risk. In the 1970's epidemiological studies established how asbestos causes disease.

According to expert testimony at trial the standards of acceptable amounts of asbestos exposure were accordingly lowered to minimize the risk of asbestos. During 1959 to 1967, permissible exposure levels would have been 30 fibers per cubic centimeter pursuant to American Conference of Governmental Industrial Hygienists (ACGIH) standards. In 1968, the ACGIH lowered the standard from 30 fibers per cubic centimeter to 12 fibers per cubic centimeter. OSHA (Occupational Safety and Health Administration) rules regarding asbestos exposure came out in 1971 or 1972, and OSHA lowered the standard in 1976 to two fibers per cubic centimeter. In 1986, OSHA again lowered the standard to 0.2 fibers per cubic centimeter, and in 1994, lowered acceptable exposure to 0.1 fibers per cubic centimeter.

### 1. *Jury Instructions*

Plaintiffs submitted proposed jury instructions based upon CACI Nos. 1203 (design defect, consumer expectation test)[6] and 1205 (strict liability, failure to

---

[6] CACI No. 1203 reads: "[*Name of plaintiff*] claims the [*product*]'s design was defective because the [*product*] did not perform as safely as an ordinary consumer would have expected it to perform. To establish this claim, [*name of plaintiff*] must prove all of the following: [¶]

warn).[7] The court indicated it would not give CACI No. 1203, the consumer expectations test instruction, because it was "not applicable in this type of situation," but that it would give CACI No. 1204 (risk/benefit theory of products liability) and CACI No. 1205. The court, however, did not include CACI No. 1205 with the jury instruction packet or orally admonish the jury. Although the court did not instruct with strict liability failure to warn, the court instructed the jury with CACI No. 1222, negligent failure to warn about dangerous conditions of a product. The record indicates that plaintiffs may have acquiesced to the exclusion of CACI No. 1205 prior to jury instruction by indicating they were proceeding solely on a negligent failure to warn theory;[8] further, they did not object to the court's failure to include the instruction with the jury instruction packet or to orally admonish the jury on the issue. Nonetheless in closing argument, plaintiffs argued the issue of strict liability failure to warn to the jury.

### 2. *Jury Verdict*

During deliberations, the jury asked for a legal definition of the word "defect" as used in the verdict form. The court stated, "I don't think there is a legal definition of the word 'defect.' . . . In [CACI No.] 1202, it's described as strict liability, . . . and it reads 'A product contains a manufacturing defect if the product differs from the manufacturer's design or specifications or from other typical units of the same product line.' " The court noted that the jurors

---

1. That [*name of defendant*] [manufactured/distributed/sold] the [*product*]; [¶] 2. That the [*product*] did not perform as safely as an ordinary consumer would have expected at the time of use; [¶] 3. That [*name of plaintiff*] was harmed while using the [*product*] in a reasonably foreseeable way; and [¶] 4. That the [product]'s failure to perform safely was a substantial factor in causing [*name of* plaintiff]'s harm." (Boldface omitted.)

[7] CACI No. 1205 reads: "[*Name of plaintiff*] claims that the [*product*] lacked sufficient [instructions] [or] [warning of potential [risks/side effects/allergic reactions]]. To establish this claim, [*name of plaintiff*] must prove all of the following: [¶] 1. That [*name of defendant*] [manufactured/distributed/sold] the [*product*]; [¶] 2. That the [*product*] had potential [risks/side effects/allergic reactions] that were [known] [or] [knowable by the use of scientific knowledge available] at the time of [manufacture/distribution/sale]; [¶] 3. That the potential [risks/side effects/allergic reactions] presented a substantial danger to users of the [*product*]; [¶] 4. That ordinary consumers would not have recognized the potential [risks/side effects/allergic reactions]; [¶] 5. That [*name of defendant*] failed to adequately warn [or instruct] of the potential [risks/side effects/allergic reactions]; [¶] 6. That [*name of plaintiff*] was harmed while using the [*product*] in a reasonably foreseeable way; and [¶] 7. That the lack of sufficient [instructions] [or] [warnings] was a substantial factor in causing [*name of plaintiff*]'s harm." (Boldface omitted.)

[8] During discussion of jury instructions, the following colloquy occurred:

"The Court: I have a couple of questions here. The intentional failure to warn has been taken out?

"[Saller's counsel]: That's correct.

"The Court: So 1205 should be taken out also. 1205 is the intentional failure to warn. 1222 is the negligence failure to warn.

"[Saller's counsel]: That's the one we're going on, yes, Your Honor."

were asking for the definition of a word that was not amenable to being broken down further, and that it did not see a definition of defect in the other instructions. The court referred jurors to the "1200 series" of instructions: CACI Nos. 1200, 1204, and 1220 through 1222.

The jury's answers to the special verdict stated it found that Saller was exposed to asbestos-containing pipe insulation manufactured by Crown, but that there was no defect in the design of Crown's asbestos-containing pipe insulation because the risks of its use did not outweigh the benefits of its design. The jury further found that Crown's asbestos-containing pipe insulation was not defective because of any negligent failure to warn of potential risks which were known or knowable in light of generally recognized and prevailing best medical and scientific knowledge at the time of manufacture and distribution. The jury made no findings on the issue of causation.

## DISCUSSION

### I. *CACI No. 1203, Consumer Expectations Test*

Plaintiffs contend the trial court erred in refusing to give a jury instruction based on the "consumer expectations" test under which the product has a defective design where it does not perform as safely as an ordinary consumer would have expected at the time of use, and the test applies in asbestos cases. Crown contends the consumer expectations test does not apply because Saller's complaint failed to allege that the asbestos insulation failed to perform as an ordinary consumer would expect; furthermore, the evidence did not support such an instruction because Saller failed to show what a reasonable consumer would have expected under an objective standard in 1959 to 1967. Further, Crown argues the evidence only showed a reasonable expectation that Standard Oil would warn about asbestos products, and any error was harmless because Saller was permitted to instruct on the risk/benefit theory of strict liability.

#### A. *Strict Liability: Design Defect*

A manufacturer may be held strictly liable for placing a defective product on the market if the plaintiff's injury results from a reasonably foreseeable use of the product. (*Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 560 [34 Cal.Rptr.2d 607, 882 P.2d 298] (*Soule*); *Sparks v. Owens-Illinois, Inc.* (1995) 32 Cal.App.4th 461, 472 [38 Cal.Rptr.2d 739] (*Sparks*).) Products liability may be premised upon a theory of design defect, manufacturing defect, or failure to warn. (*Anderson v. Owens-Corning Fiberglas Corp.* (1991) 53 Cal.3d 987, 995 [281 Cal.Rptr. 528, 810 P.2d 549] (*Anderson*).) Defective design may be established under two theories: (1) the

consumer expectations test, which asks whether the product performed as safely as an ordinary consumer would expect when used in an intended and reasonably foreseeable manner; or (2) the risk/benefit test, which asks whether the benefits of the challenged design outweigh the risk of danger inherent in the design. (*Id.* at p. 995; *Barker v. Lull Engineering Co.* (1978) 20 Cal.3d 413, 432 [143 Cal.Rptr. 225, 573 P.2d 443] (*Barker*).) Both theories may be presented to the jury. (*McCabe v. American Honda Motor Co.* (2002) 100 Cal.App.4th 1111, 1126 [123 Cal.Rptr.2d 303] (*McCabe*).)

1. *The Relation of the Consumer Expectations and Risk/Benefit Tests*

■ The rationale of the consumer expectations test is that "[t]he purposes, behaviors, and dangers of certain products are commonly understood by those who ordinarily use them." (*Soule, supra,* 8 Cal.4th at p. 566.) Therefore, in some cases, ordinary knowledge of the product's characteristics may permit an inference that the product did not perform as safely as it should. "*If* the facts permit such a conclusion, and *if* the failure resulted from the product's design, a finding of defect is warranted without any further proof," and the manufacturer may not defend by presenting expert evidence of a risk/benefit analysis. (*Ibid.*) The consumer expectations test is reserved for cases in which the everyday experience of the products' users permits a conclusion that the product's design violated minimum safety assumptions, and is "defective *regardless of expert opinion about the merits of the design.*" (*Id.* at p. 567.) Therefore, if the minimum safety of a product is within the common knowledge of lay jurors, expert witnesses may not be used to demonstrate what an ordinary consumer should expect. Nonetheless, the inherent complexity of the product itself is not controlling on the issue of whether the consumer expectations test applies; a complex product "may perform so unsafely that the defect is apparent to the common reason, experience, and understanding of its ordinary consumers." (*Id.* at p. 569.)

■ In *Campbell v. General Motors Corp.* (1982) 32 Cal.3d 112, 127 [184 Cal.Rptr. 891, 649 P.2d 224], the court noted that the quantum of proof necessary to establish a design defect under the consumer expectations test could not be reduced to an "easy formula." "However, if the product is one within the common experience of ordinary consumers, it is generally sufficient if the plaintiff provides evidence concerning (1) his or her use of the product; (2) the circumstances surrounding the injury; and (3) the objective features of the product which are relevant to an evaluation of its safety." (*Id.* at p. 127.) The test is that of a hypothetical reasonable consumer, not the expectation of the particular plaintiff in the case. (*Id.* at p. 126, fn. 6.)

On the other hand, "the jury may not be left free to find a violation of ordinary consumer expectations whenever it chooses. Unless the facts actually permit an inference that the product's performance did not meet the minimum safety expectations of its ordinary users, the jury must engage in the balancing of risks and benefits required by the second prong of *Barker*." (*Soule, supra,* 8 Cal.4th at p. 568.) The consumer expectations test is inappropriate "when the ultimate issue of design defect calls for a careful assessment of feasibility, practicality, risk, and benefit," since "in many instances it is simply impossible to eliminate the balancing or weighing of competing considerations in determining whether a product is defectively designed or not." (*Id.* at pp. 562–563.)

If the consumer expectations test is not used, under the risk/benefit test, the plaintiff may establish the product is defective by showing that its design proximately caused his injury and the defendant then fails to establish that on balance the benefits of the challenged design outweigh the risk of danger inherent in such design. (*Barker, supra,* 20 Cal.3d at p. 432.) In such case, the jury must evaluate the product's design by considering the gravity of the danger posed by the design, the likelihood such danger would occur, the feasibility of a safer alternative design, the financial cost of an improved design, and the adverse consequences to the consumer resulting from an alternative design. (*Barker,* at p. 431.) "In such cases, the jury *must* consider the manufacturer's evidence of competing design considerations . . . , and the issue of design defect cannot fairly be resolved by standardless reference to the 'expectations' of an 'ordinary consumer.' " (*Soule, supra,* 8 Cal.4th at p. 567, citation omitted.) Once the plaintiff has made a prima facie showing that his or her injury was caused by the product's defective design, the burden shifts to the defendant to establish that, in light of the relevant factors, the product is not defective.[9] (*Baker,* at p. 431.)

■ Whether the jury should be instructed on either the consumer expectations test or the risk/benefit test depends upon the particular facts of the case. (*McCabe, supra,* 100 Cal.App.4th at p. 1122.) In a jury case, the trial court must initially determine as a question of foundation, within the context of the facts and circumstances of the particular case, whether the product is one about which the ordinary consumer can form reasonable minimum safety expectations. (*Id.* at pp. 1125–1126, fn. 7.) "If the court concludes it is not, no

---

[9] In *Soule,* the Supreme Court found that a claim that General Motors's defective design of the wheel assembly and front floorboard enhanced the plaintiff's injuries in a collision required a risk/benefit analysis. The court concluded the plaintiff's theory involved technical and mechanical detail beyond the consumer's understanding or experience because "ordinary experience and understanding [would not] inform such a consumer how safely an automobile's design should perform under the esoteric circumstances of the collision at issue . . . . Indeed, both parties assumed that quite complicated design considerations were at issue . . . ." (*Soule, supra,* 8 Cal.4th at p. 570.)

consumer expectation instruction should be given. . . . If, on the other hand, the trial court finds there is sufficient evidence to support a finding that the ordinary consumer can form reasonable minimum safety expectations, the court should instruct the jury, consistent with Evidence Code section 403, subdivision (c), to determine whether the consumer expectation test applies to the product at issue in the circumstances of the case [or] to disregard the evidence about consumer expectations unless the jury finds that the test is applicable. If it finds the test applicable, the jury then must decide whether the product failed to perform as safely as an ordinary consumer would expect when the product is used in an intended or reasonably foreseeable manner." (*Ibid.*, citation omitted.)

### 2. The Consumer Expectations Test Applies to Asbestos Products

■ Several cases have applied the consumer expectations test to asbestos-containing products. (*Sparks, supra*, 32 Cal.App.4th at p. 476; *Jones v. John Crane, Inc.* (2005) 132 Cal.App.4th 990, 1002–1003 [35 Cal.Rptr.3d 144].) In *Sparks*, the defendant manufactured a product known as "Kaylo," which consisted of 13 to 20 percent asbestos, primarily chrysotile. Kaylo was sold in pipe-covering and block forms, and was used for industrial high-temperature thermal insulation. (*Sparks*, at p. 465.) The plaintiff encountered Kaylo insulation while in the Navy, during a six-month period in which he removed and inspected asbestos insulation on pipes and valves. The insulation was removed by cutting and sawing, which produced sawdust consisting of the insulation material. Regular cleanup procedures involved the use of compressed air and foxtail brooms, both of which generated large amounts of dust. (*Id.* at p. 466.)

*Sparks* held that the consumer expectations test applied to the plaintiff's claims for products liability based upon design defect because there were no " 'complicated design considerations,' " " 'obscure components,' " or " 'esoteric circumstances' " surrounding the plaintiff's use of Kaylo, which was a common type of asbestos block insulation. *Sparks* noted that Kaylo was a simple, stationary product in ordinary use that had to be cut and shaped to perform its insulating function; this cutting created large of amounts of asbestos-laden dust during the normal installation, inspection, removal and replacement processes. "The design failure was in Kaylo's emission of highly toxic, respirable fibers in the normal course of its intended use and maintenance as a high-temperature thermal insulation. It is a reasonable inference from the evidence that this emission of respirable fibers, which were capable of causing a fatal lung disease after a long latency period, was a product failure beyond the 'legitimate, commonly accepted minimum safety assumptions of its ordinary consumers.' " (*Sparks, supra*, 32 Cal.App.4th at pp. 474–475, citing *Soule, supra*, 8 Cal.4th at pp. 569–570.)

*Sparks* further held that the use of expert testimony was not precluded in cases proceeding on the consumer expectations test because such testimony was useful to the jury in determining that ordinary users of Kaylo during the 1950's and 1960's did not expect to develop a fatal disease from simply breathing Kaylo dust and therefore that the product did not meet the minimum safety assumptions of ordinary consumers. (*Sparks, supra,* 32 Cal.App.4th at pp. 476–477.)

In *Jones v. John Crane, Inc., supra,* 132 Cal.App.4th 990, the plaintiff was regularly exposed to valve and pump packing materials made of asbestos while in the Navy. (*Id.* at p. 996.) On appeal, the defendant manufacturer argued that the trial court erred in instructing with the consumer expectations test because issues of alleged product defect and its causal relationship to the plaintiff's illness could only be resolved by the testimony of experts because "nothing in the 'everyday experience of users of valve and pump packing would permit them to form any assumptions concerning the health risks attendant to the use of such a product.' " (*Id.* at p. 1001.) *Jones* rejected the defendant's argument that *Sparks* was distinguishable because while the insulation in *Sparks* was of relatively simple design, the defendant's product required a host of experts to explain the complex nature and behavior of its products, the amount of asbestos released during ordinary handling, and disputed testimony concerning the degree to which asbestos fibers were embedded in the product. (*Jones,* at p. 1002.) "The fact that expert testimony was required to establish legal causation for plaintiffs' injuries does not mean than an ordinary user of the product would be unable to form assumptions about the safety of the products. The consumer expectations test does not require inquiry into how exposure to a particular level of asbestos may lead to the development of cancer." (*Id.* at p. 1003.)

B. *Analysis*

Here, plaintiffs argue there was nothing complicated or obscure about the design of Mundet insulation or anything that would have alerted an ordinary user that breathing its dust was harmful; in fact, the product was dangerous in the normal course of its intended use as insulation. Plaintiffs argue the error was prejudicial because if properly instructed, it was reasonably probable the jury would have concluded that the Mundet insulation did not meet the minimum safety expectations of normal consumers.[10]

[10] Plaintiffs contend the jury would have found causation based upon the evidence that asbestos is the only known cause of mesothelioma, Saller was exposed to substantial levels of asbestos, and there is no known safe level of exposure. However, on the special verdict form, the jury did not reach the issue of causation because it had found no design defects. In light of our reversal on instructional error grounds, we will not speculate on what the jury might have found had it reached the issue of causation.

Crown complains that the test does not apply in the first instance because there were no consumer expectations about the safety of asbestos in the 1950's and 1960's. Crown further argues that plaintiffs did not present any objective evidence, aside from Saller's subjective testimony, about consumer expectations of asbestos insulation during his employment at Standard Oil. Crown contends Saller's testimony alone is insufficient because in cases like *Sparks*, the plaintiff's coworkers testified concerning their expectations about the product. Further, under *Campbell*, because the test is objective, Saller's subjective expectations concerning asbestos were insufficient to support a submission of the instruction to the jury. Finally, Crown argues the only applicable test was the risk/benefit theory, the court instructed the jury on that test, and the jury found no liability.

■ Here, we agree that the consumer expectations test applied to the use of asbestos at Standard Oil and that Saller's testimony concerning his expectations about its safety in its ordinary use at Standard Oil were sufficient to require a jury instruction on the issue. The use of asbestos insulation is a product that is within the understanding of ordinary lay consumers. In addition, Saller presented evidence concerning his exposure to the product (in frequent and close proximately to those workers actually using it); the circumstances surrounding his injury (use of asbestos insulation, an apparently innocuous product, frequently produced significant amounts of asbestos-containing dust that he inhaled); and the objective features of the product relevant to an evaluation of its safety (the product was always cut or sawed when used, always produced dust, and was frequently used). Given these circumstances and the widespread use of asbestos in refineries and other industries, the jury could infer that the ordinary consumer of the product, namely refinery workers, would assume that the use of the product was safe, notwithstanding the amount of dust produced.[11]

■ Crown misconstrues the nature of the test by positing that it does not apply to asbestos products in use in the 1950's and 1960's because no one knew of the dangers of asbestos at that time. If knowledge of the hazardous nature of the product were a prerequisite for the test to apply, then no product would ever fail to meet the safety expectations of the reasonable consumer.

---

[11] The record here does not contain specific testimony from Saller or other workers in the refinery concerning their expectations on the safety of the asbestos insulation used. (See, e.g., *Sparks, supra*, 32 Cal.App.4th at p. 467 [plaintiff presented deposition testimony of his coworkers that they had no idea that their workplace exposure to asbestos could be dangerous to their health; they "simply assumed that it was part of their job and that there was no particular danger in it"].) However, such testimony, while useful, is not necessary to Saller's case. As set forth in *Soule*, " 'ordinary knowledge . . . as to . . . [the product's] characteristics' (Rest.2d Torts[,] [§ 402A,] com. i., p. 352) may permit an inference that the product did not perform as safely as it should." (*Soule, supra*, 8 Cal.4th at p. 566.) Saller testified to his knowledge concerning the asbestos insulation's characteristics.

Further, Crown erroneously assumes that because the only evidence plaintiffs presented on the issue was Saller's testimony, not only was it insufficient to support the giving of an instruction, Saller's viewpoint was also subjective. On the first point, Crown's complaints go to the weight of the evidence, not whether the instruction applies in the first instance. For the test to apply, *Barker* requires that the facts permit an inference that the product did not meet minimum safety expectations of its ordinary users. (*Soule, supra*, 8 Cal.4th at p. 568.) To establish this inference, the testimony of a single witness is sufficient. (See *People v. Richardson* (2008) 43 Cal.4th 959, 1030–1031 [77 Cal.Rptr.3d 163, 183 P.3d 1146] [testimony of single witness is sufficient for proof of fact].) Furthermore, there was nothing in the record to support Crown's assertion that Saller's testimony was subjective. On the contrary, he testified to undisputed facts: the plants where he worked, the jobs he performed, the procedures of his coworkers, the use of asbestos insulation, and the dust in the air. Saller's work experience and exposure to the regular and systematic use of asbestos insulation could permit the jury to draw conclusions about whether the insulation performed as safely as an ordinary consumer (in this case a refinery worker) would expect.[12]

## II. *CACI No. 1205, Strict Liability Failure to Warn*

Plaintiffs contend the trial court erred in failing to give CACI No. 1205, although they requested the instruction and the trial court agreed to give it. They contend the evidence supported the instruction because Crown did not provide any warnings with its products, although the knowledge at the time (1950's and 1960's) about the dangers of asbestos would have required a warning in light of the scientific and medical knowledge at the time. Crown contends that the instruction was intentionally withdrawn by plaintiffs' counsel and they did not object when it was not given, and they therefore have waived any complaint of error. Plaintiffs argue any waiver was inadvertent because they fully intended to rely on the theory, and argued the applicability of strict liability failure to warn to the jury.

### A. *The Issue of Waiver of CACI No. 1205 Is Mooted by Our Reversal for Failure to Give CACI No. 1203*

We need not address whether plaintiffs waived the applicability of CACI No. 1205 by failing to object to its apparent inadvertent omission at trial. The

---

[12] Crown argues that plaintiffs' complaint did not contain any factual allegations supporting instruction on the consumer expectations test, and that the trial court rendered no decision on plaintiffs' motion in limine to permit evidence on the consumer expectations test. This argument is not fatal to plaintiffs' assertion of the test as a theory of recovery at trial. Crown did not raise any objection in the trial court or demonstrate prejudice from either the trial court's failure to rule on the motion or the lack of allegations in the complaint. Furthermore, pleadings are subject to amendment to conform to proof after trial. (*Pellegrini v. Weiss* (2008) 165 Cal.App.4th 515, 527 [81 Cal.Rptr.3d 387].)

effect of an unqualified reversal is to vacate the judgment and leave the case "at large" for further proceedings, including retrial, as if it had never been tried and no judgment had been entered. (*Regents of University of California v. Public Employment Relations Bd.* (1990) 220 Cal.App.3d 346, 356–357 [269 Cal.Rptr. 563].) We reverse the judgment in this case based on the trial court's failure to instruct on the consumer expectations test, which puts the case at large for retrial. For that reason, although we need not reach the issue of whether the court erred in refusing instruction on strict liability failure to warn, we will do so here to provide guidance to the trial court if a retrial of this matter is conducted. (*Vasquez v. Superior Court* (1971) 4 Cal.3d 800, 821, fn. 18 [94 Cal.Rptr. 796, 484 P.2d 964]; *Diaz v. Oakland Tribune, Inc.* (1983) 139 Cal.App.3d 118, 131 [188 Cal.Rptr. 762].)

## B. *The Facts Supported the Giving of CACI No. 1205*

▮▮ California recognizes failure to warn as a species of design defect products liability. (*Anderson, supra*, 53 Cal.3d at pp. 994–995.) Under the failure to warn theory, a product may be defective even though it is manufactured or designed flawlessly. (*Canifax v. Hercules Powder Co.* (1965) 237 Cal.App.2d 44, 52–53 [46 Cal.Rptr. 552].) "[A] product, although faultlessly made, may nevertheless be deemed 'defective' under the rule and subject the supplier thereof to strict liability if it is unreasonably dangerous to place the product in the hands of a user without a suitable warning and the product is supplied and no warning is given." (*Id.* at p. 53; see *Anderson*, at pp. 995–996.)

In *Cavers v. Cushman Motor Sales, Inc.* (1979) 95 Cal.App.3d 338 [157 Cal.Rptr. 142], the court considered whether a product could be defective solely based upon a failure to warn of risks in using the product. The plaintiff contended a golf cart that had been otherwise properly manufactured was defective due to its propensity to tip over when turning because of the absence of a manufacturer's warning of this propensity. The plaintiff presented no evidence that the cart was defective in design or manufacture. (*Id.* at pp. 341–342.) *Cavers* noted in the case of a failure to warn, the jury must decide "whether a product flawlessly designed and produced may nevertheless possess such risks to the user without a suitable warning that it becomes 'defective' simply by the absence of a warning." (*Id.* at pp. 346–347.)

For this reason, *Cavers* relied on the defect tests set forth in *Barker, supra*, 20 Cal.3d at page 432 to assist in determining whether an otherwise properly designed and manufactured product was defective for failure to warn. The

jury could consider the normal expectations of the consumer as to how the product would perform, degrees of simplicity or complication in the operation or use of the product, the nature and magnitude of the danger to which the user is exposed, the likelihood of injury and the feasibility and beneficial effect of including a warning. (*Cavers v. Cushman Motor Sales, Inc., supra*, 95 Cal.App.3d at pp. 347–348; *Anderson, supra*, 53 Cal.3d at p. 996.)

■ The duty to warn requires that the manufacturer knows, or should have known, of the danger of the product at the time it is sold or distributed. (*Brown v. Superior Court* (1988) 44 Cal.3d 1049, 1065–1066 [245 Cal.Rptr. 412, 751 P.2d 470]; *Anderson, supra*, 53 Cal.3d at p. 1000.) Strict liability failure to warn requires the plaintiff to prove that the defendant "did not adequately warn of a particular risk that was known or knowable in light of the generally recognized and prevailing best scientific and medical knowledge available at the time of manufacture and distribution. . . ." (*Anderson*, at pp. 1002–1003, fn. omitted.) Otherwise, the manufacturer would become a virtual insurer of the product. (*Brown*, at p. 1066.) "If every product that has no warning were defective per se and for that reason subject to strict liability, the mere fact of injury by an unlabelled product would automatically permit recovery. That is not, and has never been, the purpose and goal of the failure-to-warn theory of strict liability." (*Anderson*, at p. 1002.)

Here, although there was evidence that the scientific and industrial communities were aware of the dangers of asbestos exposure in causing disease beginning in the 1930's, strict exposure standards were not developed until the late 1960's at the earliest. On the one hand, plaintiff presented testimony that in the mid-1950's Standard Oil knew of the problems with asbestos exposure and recommended respirator use for its plants, although it did not implement them. On the other hand, during the 1950's and 1960's, medical attitudes towards the hazards of asbestos exposure were only beginning to crystallize into a program of prevention, and in the 1970's standards were developed. Thus, the question should have been submitted to the jury under a strict liability failure to warn theory whether Saller, who worked at Standard Oil from 1959 to 1967, was entitled to a warning about the dangers of using asbestos without precautions in light of the prevailing knowledge at the time.

■ Furthermore, our conclusion is not changed by the fact the jury found Saller had not prevailed on a negligence theory of failure to warn. "Negligence and strict products liability are separate and distinct bases for liability that do not automatically collapse into each other because the plaintiff might allege both when a product warning contributes to her injury." (*Conte v. Wyeth, Inc.* (2008) 168 Cal.App.4th 89, 101 [85 Cal.Rptr.3d 299].) "Negligence law in a failure-to-warn case requires a plaintiff to prove that a

manufacturer or distributor did not warn of a particular risk for reasons which fell below the acceptable standard of care, i.e., what a reasonably prudent manufacturer would have known and warned about." (*Ibid.*) Strict liability, on the other hand, does not consider the standard of due care or the reasonableness of a manufacturer's conduct. Under a theory of strict liability, the plaintiff need only prove that "the defendant did not adequately warn of a particular risk that was known or knowable in light of the generally recognized and prevailing best scientific and medical knowledge available at the time of manufacture and distribution. Thus, in strict liability, as opposed to negligence, the reasonableness of the defendant's failure to warn is immaterial." (*Anderson, supra,* 53 Cal.3d at pp. 1002–1003, fn. omitted.) Here, the jury's findings on negligent failure to warn therefore do not preclude a finding that the trial court erred in failing to instruct on strict liability. (See *Milwaukee Electric Tool Corp. v. Superior Court* (1993) 15 Cal.App.4th 547, 557–558 [19 Cal.Rptr.2d 24] [findings on negligence do not prelude liability under strict liability theory].)

Finally, Crown argues that the exclusion of CACI No. 1205 was harmless because the jury impliedly found against plaintiffs on the strict liability failure to warn issue as evidenced by their answer to special verdict question No. 11, which asked the jury whether "there was a failure to warn of potential risks which were known, or knowable, in light of the generally recognized and prevailing best medical and scientific knowledge at the time of manufacture and distribution." This language is taken from CACI No. 1205, and is only a partial recitation of the elements of the tort. The elements of negligent failure to warn (on which the jury was instructed)[13] and strict liability failure to warn are different in several respects. Given the differences in the two theories, we disagree with Crown's harmless error analysis because it requires us to speculate on what the jury would have found if fully and properly instructed on strict liability failure to warn. (See *Henderson v. Harnischfeger Corp.* (1974) 12 Cal.3d 663, 670 [117 Cal.Rptr. 1, 527 P.2d 353].)

---

[13] As given to the jury, CACI No. 1222 provides, "Plaintiffs also claim that Defendants, were negligent by not using reasonable care to warn or instruct about the product's dangerous condition or about facts that make the product likely to be dangerous. To establish this claim, Plaintiffs must prove all of the following: [¶] 1. That Defendants manufactured/distributed/sold the product; [¶] 2. That Defendants knew or reasonably should have known that the product was dangerous or was likely to be dangerous when used in a reasonably foreseeable manner; [¶] 3. That Defendants knew or reasonably should have known that users would not realize the danger; [¶] 4. That Defendants failed to adequately warn of the danger or instruct on the safe use of the product; [¶] 5. That a reasonable manufacturer/distributor/ seller under the same or similar circumstances would have warned of the danger or instructed on the safe use of the product; [¶] 6. That William Saller was harmed; and [¶] 7. That Defendants' failure to warn or instruct was a substantial factor in causing William Saller's harm."

## DISPOSITION

The judgment of the superior court is reversed. Appellants are to recover their costs on appeal.

Mallano, P. J., and Rothschild, J., concurred.

Respondent's petition for review by the Supreme Court was denied December, 1, 2010, S187072.