Filed 12/21/22  Certain Underwriters at Lloyd's etc. v. Whirlpool Corp. CA2/1

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| CERTAIN UNDERWRITERS AT LLOYD'S, LONDON SUBSCRIBING TO POLICY NO. HGB0123931, <br><br> Plaintiff and Appellant, <br><br> v. <br><br> WHIRLPOOL CORPORATION, et al., <br><br> Defendants and Respondents. | B321573 <br><br> (Los Angeles County Super. Ct. No. 20STCV05388) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Mark A. Borenstein, Judge.  Affirmed.

Swain & Dipolito, Frank X. Dipolito and Ross I. Landau for Plaintiff and Appellant.

No appearance for Defendants and Respondents.

_____

A married couple (the insureds) owned a washing machine manufactured by defendant and respondent Whirlpool Corporation (Whirlpool), which they kept in the basement of their residence. Several years after they acquired the washer, it overflowed and flooded the basement, causing substantial property damage. The accident resulted from a malfunctioning valve in the washing machine; the valve was manufactured by defendant and respondent Robertshaw Controls Company (Robertshaw).

Plaintiff and appellant Certain Underwriters at Lloyd's, London Subscribing to Policy No. HGB0123931 (Underwriters) paid the insureds' property damage claim pursuant to their insurance policy, and thereafter sued Whirlpool and Robertshaw on a strict products liability design defect claim. After a bench trial, the trial court entered judgment in favor of Whirlpool and Robertshaw.

On appeal, Underwriters advances two claims of error: (1) the trial court erred in concluding that Underwriters failed to establish a prima facie case of liability under the risk/benefit test, and (2) the court erred in declining to assess Underwriters' design defect claim under the consumer expectations test. We reject the first claim of error because at trial, Underwriters failed to prove its theory of causation, to wit, that the lack of a particular safety device capable of detecting and mitigating the overflow would have averted the accident. We reject Underwriters' second claim—that the trial court erred in not applying the consumer expectations test—because Underwriters' defective design theory required the factfinder to examine the behavior of obscure machine components under complex

circumstances that are outside a consumer's ordinary experience. Finding no error, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND[1]

We summarize only those facts pertinent to our disposition of this appeal.

In 2007, the insureds purchased a washing machine that was manufactured by Whirlpool in or around January 2007.[2] The washer was placed in the basement of the insureds' residence.

---

[1] We derive our factual and procedural background primarily from undisputed aspects of the trial court's statement of decision and from concessions made in Underwriters' filings. (See *Baxter v. State Teachers' Retirement System* (2017) 18 Cal.App.5th 340, 349, fn. 2 [utilizing the summary of facts provided in the trial court's ruling]; Standards of Review, *post* [noting that the trial court's orders and judgments are presumed correct]; *Artal v. Allen* (2003) 111 Cal.App.4th 273, 275, fn. 2 [" '[B]riefs and argument . . . are reliable indications of a party's position on the facts as well as the law, and a reviewing court may make use of statements therein as admissions against the party.' "].)

[2] Underwriters intimates in its opening brief that the insureds purchased the washer in February 2017. Admittedly, one of the insureds responded in the affirmative to the following question posed by Underwriters' counsel at trial: "In 2017 did you have a washing machine installed in your home?" Yet, Underwriters averred in its complaint that the insureds purchased the machine "[i]n or about 2007," and the trial court found the insureds purchased the machine in 2007. In any event, this apparent discrepancy has no impact on the instant appeal.

On February 11, 2017, the washing machine overflowed and flooded the basement floor. A component part of the washer, to wit, a solenoid valve manufactured by Robertshaw, had malfunctioned, causing water to pass through the open solenoid and overfill the washing machine tub. Underwriters concedes in its opening brief that the washer was turned off when this incident occurred.[3] None of the experts who later testified at trial could, with any degree of probability, identify what had caused the solenoid valve to remain in the open position.

Upon discovering the flooding, one of the insureds telephoned the plumber to shut off the water. Pursuant to the insureds' policy, Underwriters later paid the insureds $500,000 for the damage caused to their residence. No one suffered personal injury as a result of the incident.

After Underwriters paid the insureds' claim, Underwriters, as the insureds' subrogee, sued Whirlpool and Robertshaw. Underwriters asserted a strict liability manufacturing defect claim against Robertshaw, and a strict liability design defect claim against Whirlpool and Robertshaw. Although Underwriters initially also brought a negligence claim, Underwriters abandoned that claim at the beginning of trial.

---

[3] Specifically, Underwriters states: "Although the subject washer contained a fill pressure switch (which detected the level of water in the washer tub) and a drain pump (which pumped the water out of the tub), neither of these features, either alone or in combination, could avert uncontrolled flooding in a machine malfunction *such as occurred in this case*. [Citation.] [Underwriters' expert witness, Tony] Holden[,] explained that this was so because the subject washer was designed so that neither of these components could operate *when the washer was turned off* (e.g., after a wash cycle was complete.)" (Italics added.)

The trial court conducted a five-day bench trial. On April 8, 2022, the court issued a statement of decision explaining why it had concluded that Robertshaw and Whirlpool were entitled to judgment in their favor on Underwriters' claims.[4] On May 20, 2022, the court entered judgment in accordance with the statement of decision. On June 13, 2022, Underwriters appealed the judgment.

## STANDARDS OF REVIEW

"A manufacturer may be held strictly liable for placing a defective product on the market if the plaintiff's injury results from a reasonably foreseeable use of the product. [Citations.] Products liability may be premised upon a theory of design defect, manufacturing defect,[5] or failure to warn. [Citation.] Defective design may be established under two theories: (1) the consumer expectations test, which asks whether the product performed as safely as an ordinary consumer would expect when used in an intended and reasonably foreseeable manner; or (2) the risk/benefit test, which asks whether the benefits of the challenged design outweigh the risk of danger inherent in the

---

[4] We address pertinent aspects of the statement of decision in Discussion, parts A–B, *post*.

[5] In its opening brief, Underwriters states it "is not appealing the trial court's judgment in favor of Robertshaw on Underwriters' claim that the solenoid valve contained a manufacturing defect." Accordingly, we do not address that claim further. (See *Reyes v. Kosha* (1998) 65 Cal.App.4th 451, 466, fn. 6 ["[O]ur review . . . is limited to issues which have been adequately raised and supported in [an appellant's] brief. [Citations.] Issues not raised in an appellant's brief are deemed waived or abandoned."].)

design." (*Saller v. Crown Cork & Seal Co., Inc.* (2010) 187 Cal.App.4th 1220, 1231–1232 (*Saller*).)

"Under the risk-benefit test, the plaintiff need only establish a prima facie case of causation, i.e., evidence that a design feature of the product was a substantial factor in causing the plaintiff's injuries.  Once the plaintiff makes this showing, the burden shifts to the defendant to establish that, given certain factors, 'on balance, the benefits of the challenged design outweigh the risk of danger inherent in such design.' [Citations.]" (*Demara v. The Raymond Corp.* (2017) 13 Cal.App.5th 545, 554, fn. omitted.)  Those factors include " 'the gravity of the danger posed by the challenged design, the likelihood that such danger would occur, the mechanical feasibility of a safer alternative design, the financial cost of an improved design, and the adverse consequences to the product and to the consumer that would result from an alternative design.' [Citation.]" (See *id.* at p. 562.)

Conversely, "[t]he consumer expectations test is reserved for cases in which the everyday experience of the products' users permits a conclusion that the product's design violated minimum safety assumptions, and is 'defective *regardless of expert opinion about the merits of the design*.' [Citation.]  Therefore, if the minimum safety of a product is within the common knowledge of lay [persons], expert witnesses may not be used to demonstrate what an ordinary consumer should expect.  Nonetheless, the inherent complexity of the product itself is not controlling on the issue of whether the consumer expectations test applies; a complex product 'may perform so unsafely that the defect is apparent to the common reason, experience, and understanding

of its ordinary consumers.' [Citation.]" (See *Saller*, *supra*, 187 Cal.App.4th at p. 1232.)

We review independently whether the trial court allocated properly the burden of proof at trial. (See *Becerra v. McClatchy Co.* (2021) 69 Cal.App.5th 913, 949 ["Allocation of the burden of proof presents a question of law, which we review de novo."].) We review independently the trial court's determination that the consumer expectations test is inapplicable insofar as it rests on undisputed facts. (See *Shewry v. Begil* (2005) 128 Cal.App.4th 639, 642 ["Matters presenting pure questions of law, not involving the resolution of disputed facts, are subject to de novo review."]; cf. *Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 568 (*Soule*) ["Unless the facts actually permit an inference that the product's performance did not meet the minimum safety expectations of its ordinary users, the jury must engage in the balancing of risks and benefits . . . . [¶] . . . Instructions based on the ordinary consumer expectations [test] . . . are not appropriate where, as a matter of law, the evidence would not support a jury verdict on that theory."].)

On the other hand, "[i]n reviewing a judgment based upon a statement of decision following a bench trial, . . . [w]e apply a substantial evidence standard of review to the trial court's findings of fact. [Citation.] Under this deferential standard of review, findings of fact are liberally construed to support the judgment and we consider the evidence in the light most favorable to the prevailing party, drawing all reasonable inferences in support of the findings." (*Thompson v. Asimos* (2016) 6 Cal.App.5th 970, 981 (*Thompson*).)

" 'A judgment or order of a lower court is presumed to be correct on appeal, and all intendments and presumptions are

indulged in favor of its correctness.' [Citation.]" (*Thompson, supra,* 6 Cal.App.5th at p. 981.) Thus, " ' "it is the appellant's responsibility to affirmatively demonstrate error" ' " by " ' "supply[ing] the reviewing court with some cogent argument supported by legal analysis and citation to the record." ' [Citation.]" (See *Los Angeles Unified School Dist. v. Torres Construction Corp.* (2020) 57 Cal.App.5th 480, 492, 497 (*Los Angeles Unified School Dist.*); *Hernandez v. First Student, Inc.* (2019) 37 Cal.App.5th 270, 277 (*Hernandez*).) The appellant bears this burden of rebutting the presumption of correctness accorded to the trial court's decision, regardless of the applicable standard of review. (See *Los Angeles Unified School Dist.*, at p. 492 [noting that these principles apply to " ' "an appeal from any judgment" ' "]; see also *Orange County Water Dist. v. Sabic Innovative Plastics US, LLC* (2017) 14 Cal.App.5th 343, 368, 399 [indicating that an appellant must affirmatively show the trial court erred even if the de novo standard of review applies].) Likewise, the fact that a respondent has not made an appearance in the appellate proceedings does not absolve an appellant of this burden. (See *Golden Door Properties, LLC v. County of San Diego* (2020) 50 Cal.App.5th 467, 557, fn. 48 ["[A] respondent's failure to address an issue raised in the opening brief is not a concession."]; Cal. Rules of Court, rule 8.220(a)(2) [providing that if no respondent's brief is filed, "the court may decide the appeal on the record, the opening brief, and any oral argument by the appellant"].)

## DISCUSSION

### A. The Trial Court Did Not Err in Concluding that Underwriters Failed to Establish a Prima Facie Case Under the Risk/Benefit Test

In its statement of decision, the trial court analyzed whether Underwriters was entitled to recovery under the risk/benefit test. The court explained that, to establish a prima facie case under that theory, the "Plaintiff must prove that the product was manufactured and sold by the Defendant, that the Plaintiff was harmed, and that the product's design was a substantial factor in causing harm." The court noted that Underwriters' "expert, [Tony] Holden, testified the design defect was the failure of Defendant Whirlpool to include in its electromechanical washing machine a device or combination of devices (including a sump pump, flow meter, alternate solenoid, audible alarm), all with continuous power, that would have detected the open solenoid valve and prevented the overflooding of the washing machine basin."

At the outset of its analysis, the trial court observed that Whirlpool had not offered any evidence "concerning the costs and benefits of the proposed design change." The court further explained that although Robertshaw's expert was "completely competent on the issue of the solenoid, [he] was not an expert on the design of the washing machine," meaning that "[h]is comments on [Underwriters'] proposed design change were nothing more than speculation."

Notwithstanding Whirlpool's and Robertshaw's failure to produce admissible evidence concerning Holden's proposed design changes, the trial court concluded that Underwriters did not establish an "affirmative case" under its risk/benefit theory

9

because it had not shown that "the absence of the flood sensor or any other . . . changes suggested by . . . Holden[ ] was a substantial factor in causing the [insureds] harm."  The court explained that Underwriters' assertion that the absence of a flood detector constituted a design defect was "completely based on the testimony of . . . Holden," and that Holden "did not have the requisite background and experience to propose his alternative designs."

Specifically, the court found that even though Holden "said [he] received a short training course in appliance failures . . . and . . . worked in a building . . . that 'manufactured assemblies and sub-assemblies . . . in all sorts of appliances including washing machines[,]' " he "never testified he actually had any kind of experience working on washing machine component parts."  The court also found that Holden's "testimony about a proposed alternate design[ ] appeared to be an afterthought," given that his expert report "says nothing about a proposed alternative design that would have prevented the flooding," and, "at one point in his somewhat confusing testimony, . . . Holden said he had no opinion the washing machine was defectively designed without some kind of pump."

Additionally, the court remarked that "[e]ven if . . . Holden[ ]had some foundation to propose the alternate design, the Court did not find his testimony on this issue credible."  In particular, the court found "Holden was plainly stretching his background and experience when he proposed an alternative design involving some electrical device on a separate electrical circuit that would have directed water to a drain pump, that would have detected the water level in the basin and then somehow stopped the water or sent an alarm."

10

Underwriters asserts the trial court erred in concluding that "Underwriters failed to prove its prima facie case based on the finding that Underwriters had not established that an alternative design was feasible and would have prevented the subject loss." Furthermore, Underwriters seems to argue that "had the trial court properly applied the Risk-Benefit test," the court would have found Underwriters established causation because "the evidentiary record leaves no doubt that the subject washer did not have any safety features to detect or mitigate water overfill or overflow." As we explain below, Underwriters has not shown the trial court erred in concluding that Underwriters failed to establish its prima facie case.

### 1. The trial court did not require Underwriters to prove the feasibility of an alternative design

We reject Underwriters' assertion the trial court faulted it for failing to demonstrate that "an alternative design was feasible." At no point in its statement of decision did the trial court claim that Underwriters had to prove that an alternative design was feasible to prevail under the risk/benefit test. Rather, the trial court stated that if Underwriters had established a prima facie case of liability, then the defense would have borne the burden of offering evidence regarding the "feasibility of the [proposed alternative] design . . . ."

Additionally, we find unavailing Underwriters' citation to an excerpt from the reporter's transcript of the trial in which the court discussed the burden of proof with Underwriters' counsel. In the excerpt Underwriters cites, the court did not state that Underwriters bore the burden of establishing the feasibility of alternative designs. The court merely indicated that the defense

11

could rely on Holden's testimony to show that the designs he proffered were not feasible.

Instead of holding Underwriters responsible for failing to demonstrate that Holden's proposed alternative designs were feasible, the trial court found that Underwriters did not establish the requisite causal connection between "the absence of the flood sensor or any other . . . changes suggested by . . . Holden" and the "harm to the [insureds]" because Holden was not "qualified and competent to offer this causation testimony." Underwriters acknowledges "[t]he trial court found that . . . Holden was not qualified to propose alternative designs for the washer," but, rather than challenge this finding, Underwriters claims it is "immaterial because Underwriters does not have the burden to prove the feasability [*sic*] of alternative designs as part of its prima facie case." Because Underwriters simply mischaracterizes the trial court's ruling that Holden was not qualified and competent to offer testimony vis-à-vis causation, Underwriters leaves this key finding undisturbed. (See *Los Angeles Unified School Dist.*, *supra*, 57 Cal.App.5th at p. 492 [" ' "[R]eview is limited to issues which have been adequately raised and briefed." ' "].) We address the import of that unchallenged finding in Discussion, part A.3, *post*.

### 2. *Underwriters bore the burden of showing that an alternative design would have prevented the loss*

*Campbell v. General Motors Corp.* (1982) 32 Cal.3d 112 (*Campbell*), provides guidance on the burden of proof applicable to the risk/benefit test. In *Campbell*, the plaintiff-bus rider "was thrown to the floor on the opposite side of the bus, falling on her left hip" as "the bus driver 'turned very sharply' " at an

12

intersection.  (See *id.* at pp. 116–117.)  The plaintiff claimed that the bus manufacturer's "failure to place a guardrail or handrail within her reach proximately caused the injury."  (*Id.* at pp. 116, 120.)  At the conclusion of the plaintiff's case-in-chief on the question of liability, the manufacturer moved for a judgment of nonsuit, arguing that the "plaintiff had failed to introduce evidence sufficient to establish that the bus was defective in design or that the alleged defect was a proximate cause of plaintiff's injuries."  (*Id.* at p. 117.)  The trial court granted the motion.  (*Ibid.*)

The *Campbell* court reversed.  (*Campbell, supra,* 32 Cal.3d at p. 127.)  Upon explaining that the trial court was obligated to " 'indulg[e] every legitimate inference which may be drawn from the evidence in plaintiff['s] favor' " in ruling on a motion for nonsuit, the Supreme Court stated, "The plaintiff in a strict liability action is not required to disprove every possible alternative explanation of the injury in order to have the case submitted to the jury."  (See *id.* at pp. 118, 121.)  The high court further reiterated this point when it remarked, "To take the case from the jury simply because the plaintiff could not prove to a certainty that [an absent safety] device would have prevented the accident would enable the manufacturer to prevail on the basis of its failure to provide the safeguard.  [Citation.]  Such a rule would provide a disincentive to improve the safety features of a product and thereby interfere with one of the major policy goals of strict liability."  (See *id.* at p. 121, fn. omitted.)

The *Campbell* court further observed that a plaintiff in a strict products liability case may rely upon several different theories of causation.  (See *Campbell, supra,* 32 Cal.3d at pp. 119–120.)  A plaintiff may "point[ ] to an alleged malfunction

13

of the product as the cause of injury.  [Citations.]  In other situations, it is the absence of adequate warnings or directions which is asserted to be the cause of the injury.  [Citations.]  In still other contexts, the plaintiff seeks to establish causation on the basis of the manufacturer's failure to provide a particular safety device."  (*Ibid.*)  The Supreme Court held that "the evidence introduced by [the] plaintiff [in that case] was sufficient to withstand the motion for nonsuit" based on the third aforementioned theory of causation because "the jury could reasonably conclude that if a bar or pole had been present, plaintiff would not have been thrown to the other side of the bus and injured."  (See *id.* at pp. 122, 124.)  Thus, *Campbell* establishes that if a plaintiff proceeds on the theory that a product is defective because it lacks a particular safety feature, then the plaintiff must show that the "safety device . . . would have prevented the accident."  (See *id.* at pp. 119–120.)

Notwithstanding *Campbell*'s holding on this point, Underwriters claims the following decisions support its claim that the trial court erred in obligating Underwriters to "prove that an alternative design, including added safety features, would have prevented the loss":  *Barker v. Lull Engineering Co.* (1978) 20 Cal.3d 413 (*Barker*); *Saller, supra*, 187 Cal.App.4th 1220; and *Ramirez v. ITW Food Equipment Group, LLC* (9th Cir. 2017) 686 Fed.Appx. 435 (*Ramirez*) [memorandum disposition].  For the reasons discussed below, we disagree.

First, *Barker* did not hold that a plaintiff who has proffered one or more alternative designs—as Underwriters attempted to do below—may establish a prima facie case under the risk/benefit test without first demonstrating that the alternative designs would have allowed the plaintiff to avoid the subject loss.  *Barker*

14

merely held that "once the plaintiff makes a prima facie showing that the injury was proximately caused by the product's design, the burden should appropriately shift to the defendant to prove, in light of the relevant factors, that the product is not defective."[6] (*Barker*, *supra*, 20 Cal.3d at p. 431.)  The *Barker* court did not further elaborate on what facts a plaintiff would need to prove in order to demonstrate that the product's design was the proximate cause of the plaintiff's injury.[7]  (See *Barker*, at pp. 426–434 [articulating the risk/benefit test's burden-shifting framework without specifically addressing this issue].)  Although the Supreme Court did state that the defense could offer evidence on "the feasibility and cost of alternative designs" if the plaintiff makes its requisite prima facie showing (see *id.* at p. 431), that holding concerning the defense's burden has no bearing here because the trial court did not charge Underwriters with showing that its alternative designs were feasible.  (See Discussion, part A.1, *ante*.)

---

[6] The *Barker* court identified the following factors:  "the gravity of the danger posed by the challenged design, the likelihood that such danger would occur, the mechanical feasibility of a safer alternative design, the financial cost of an improved design, and the adverse consequences to the product and to the consumer that would result from an alternative design."  (*Barker*, *supra*, 20 Cal.3d at p. 431.)

[7] *Barker*, however, concluded that a plaintiff could not establish a design defect by merely showing he or she suffered an injury.  (See *Barker*, *supra*, 20 Cal.3d at p. 435 ["If a jury in determining liability for a defect in design is instructed only that it should decide whether or not there is 'a defective design,' it may reach to the extreme conclusion that the plaintiff, having suffered injury, should without further showing, recover . . . ."].)

15

Next, *Saller* cited *Barker* for the proposition that "[o]nce the plaintiff has made a prima facie showing that his or her injury was caused by the product's defective design, the burden shifts to the defendant to establish that, in light of the relevant factors, the product is not defective." (See *Saller, supra,* 187 Cal.App.4th at p. 1233, citing *Barker, supra,* 20 Cal.3d at p. 431.) *Saller* did not declare that a plaintiff claiming that a product is defective because of an absent safety device may establish causation without showing that its proposed alternative design would have averted the loss. (See *ibid.*) In fact, the *Saller* court had no occasion to arrive at that conclusion, given that the alleged product defect in that case was not the absence of any safety device, but the presence of disease-causing asbestos in certain pipe insulation. (See *id.* at pp. 1225–1226, 1228.)

Unlike *Barker* and *Saller*, the Ninth Circuit Court of Appeals' unpublished memorandum disposition in *Ramirez* appears to support Underwriters' assertion that it did "not have to prove that an alternative design, including added safety features, would have prevented the loss." *Ramirez* cited *Campbell* for the proposition that "[a] plaintiff need not prove that the absent safety 'device would have prevented the accident,' because such a rule might 'enable the manufacturer to prevail on the basis of its failure to provide the safeguard,' contrary to 'the major policy goals of strict liability.' " (*Ramirez, supra,* 686 Fed.Appx. at pp. 438–439, quoting *Campbell, supra,* 32 Cal.3d at p. 121.)

We respectfully disagree with *Ramirez*'s reading of *Campbell*. As indicated in our discussion of *Campbell* above, the outcome in that case turned on the deferential standard applied to motions for nonsuit (i.e., in which "the evidence most favorable

16

to [the] plaintiff must be accepted as true and conflicting evidence must be disregarded") (see *Campbell, supra,* 32 Cal.3d at p. 118), and not on a holding that a plaintiff may discharge its prima facie burden without proving that its proposed safety device would have averted the loss. Indeed, the high court acknowledged that "the plaintiff must establish a prima facie case of causation" under the risk/benefit test, and the court further indicated the plaintiff in that case could do so by offering evidence that the bus "lacked a particular safety device that would have prevented the accident." (See *Campbell,* at pp. 119–120.) We further note that our reading of the *Campbell* decision is consistent with that of Division Four of this district, which cited *Campbell* for the proposition that in order to establish causation, a plaintiff must show that "[its] ability to avoid injury was *frustrated by the absence of a safety device,* or by the nature of the product's design."[8] (See *Perez v. VAS S.p.A.* (2010)

[8] Although Underwriters claims at one point in its opening brief that it "only had the burden to prove that some aspect of the *existing* design of the washer was a substantial factor in causing the flood damage" (italics added), Underwriters does not identify any extant features of the washer (e.g., the solenoid valve) that were supposedly defectively designed. Rather, Underwriters maintains that "the *lack* of . . . safety features" capable of "detect[ing] and mitigat[ing] overfill or overflow . . . contributed to and/or exacerbated the flooding of the [insureds'] residence." (Italics added.) Therefore, Underwriters waived any argument that it had discharged its prima facie burden under the risk/benefit test by showing that an existing characteristic of the product was a substantial factor in causing the loss. (See *Hernandez, supra,* 37 Cal.App.5th at p. 277 ["We may and do 'disregard conclusory arguments that are not supported by pertinent legal authority or fail to disclose the reasoning by

17

188 Cal.App.4th 658, 678, italics added, citing *Campbell, supra,* 32 Cal.3d at pp. 125–126.) Accordingly, we decline to follow *Ramirez*'s nonbinding interpretation of the *Campbell* opinion. (See *Herpel v. County of Riverside* (2020) 45 Cal.App.5th 96, 122, fn. 25 [" '[U]npublished federal cases[ ] . . . may properly be cited as persuasive, although not binding, authority."].)

For the foregoing reasons, we conclude the trial court did not err in requiring Underwriters to show that at least one of its proposed alternative designs was a substantial factor in causing the loss.

### 3. **Underwriters does not show the trial court erred in concluding that Underwriters failed to establish causation**

Underwriters appears to argue that even if the risk/benefit test required it to show that an absent safety feature would have prevented the damage to the insureds, the "proper application" of that test would have resulted in a judgment in its favor on the design defect claim. First, Underwriters claims it "established each element of its prima facie case." Specifically, Underwriters contends "the evidentiary record leaves no doubt that the subject washer did not have any safety features to detect or mitigate water overfill or overflow," and that "if the subject washer was equipped with safety features to detect and mitigate overflow, . . . the washer likely would have detected and mitigated the overflow at issue (e.g., by alerting the homeowners, cutting off the water supply, and/or diverting the overflow to the drain), and the flooding of the [insureds'] residence more likely than not would

_____

which the appellant reached the conclusions he wants us to adopt.' "].)

18

have been reduced, if not avoided altogether." Second, Underwriters argues that "the burden should have shifted to Whirlpool to prove that the benefits of the washer's design—and specifically the lack of any features to detect and mitigate overfill and overflow—outweighed the risks of that design," and that "Whirlpool did not present any evidence" on that issue.

As an initial matter, we observe Underwriters asserts in a footnote to its opening brief that "Holden described how a washing machine could be equipped with various types of flood detectors, which could be paired with . . . (a) an audible alarm; (b) a backup solenoid valve to shut off the water supply; or (c) a signal to the drain pump to pump out the water as it filled." As we explained in Discussion, part A.1, *ante*, however, the trial court concluded that Holden was not qualified and competent to propose alternative designs for the washer, and Underwriters does not challenge properly that finding. Accordingly, Underwriters cannot obtain reversal of the trial court's judgment based on Holden's identification of alternative designs for which he was not qualified to render an opinion. (See *Estate of Sapp* (2019) 36 Cal.App.5th 86, 104 [" 'It is well settled that all presumptions and intendments are in favor of supporting the judgment or order appealed from, and that the appellant has the burden of showing reversible error, and in the absence of such showing, the judgment or order appealed from will be affirmed.' "]; see also *In re Joy M.* (2002) 99 Cal.App.4th 11, 19 ["To testify as an expert, a witness must possess adequate knowledge, training, and experience."].)

Aside from Holden's design proposals, Underwriters does not identify any *specific* safety feature omitted from the washer's design that would have averted the damage to the

19

insureds' home.  Underwriters merely complains that "the lack of any features to detect and mitigate overfill and overflow" constituted a design defect.  Underwriters does not cite any authority demonstrating that it could satisfy its prima facie burden by identifying a purported defect at such a high level of generality.  For that reason alone, this argument fails.  (See *Cahill v. San Diego Gas & Electric Co.* (2011) 194 Cal.App.4th 939, 956 [" 'Appellate briefs must provide argument and legal authority for the positions taken.  "When an appellant fails to raise a point, or asserts it but fails to support it with reasoned argument and citations to authority, we treat the point as waived." ' "].)

Moreover, *Campbell* undermines Underwriters' position.  There, the Supreme Court stated repeatedly that a plaintiff may establish causation under the risk/benefit test by showing that the harm was caused by the absence of "a *particular* safety device."  (See *Campbell*, *supra*, 32 Cal.3d at pp. 120, 126, italics added.)  The plaintiff in that case satisfied that burden by offering circumstantial "evidence that a handrail or guardrail within her reach would have prevented the accident."  (See *id.* at pp. 121–122.)  Underwriters' vague assertion that the insureds' loss would not have occurred "if the subject washer was equipped with safety features to detect and mitigate overflow . . . (e.g., by alerting the homeowners, cutting off the water supply, and/or diverting the overflow to the drain)" pales in comparison to the specific absent safety devices the plaintiff identified in *Campbell*.  In fact, Underwriters does little more than simply restate the standard for proving that an absent safety device caused the harm without actually providing any analysis to support that conclusion (i.e., precisely identifying such a device and explaining

20

how it would have averted the accident). Consequently, applying the substantial evidence standard, we cannot disturb the trial court's factual finding that Underwriters did not show that the absence of "a *particular* safety device" was a substantial factor in causing the harm.[9]

In sum, Underwriters fails to affirmatively demonstrate the trial court erred in concluding that Underwriters had not established its prima facie case under the risk/benefit test.

## B. The Trial Court Did Not Err in Concluding that the Consumer Expectations Test Is Inapplicable

On appeal, Underwriters claims "[t]he foundational question [for determining whether the consumer expectations test is applicable is] whether ordinary consumers can form minimum flood safety expectations for a washing machine that is installed in a residence and used for household laundry," and that "[i]f the evidence at trial permitted an inference that an ordinary consumer of washing machines had expectations as to whether and when a washing machine would overflow and flood a residence during normal household use, then the Consumer Expectation Test should have been applied." In connection with this claim of error, Underwriters does not assert that any

---

[9] (*Campbell*, *supra*, 32 Cal.3d at pp. 120, 126, italics added; *Thompson*, *supra*, 6 Cal.App.5th at p. 981 ["We apply a substantial evidence standard of review to the trial court's findings of fact."]; see *CUNA Mutual Life Ins. Co. v. Los Angeles County Metropolitan Transportation Authority* (2003) 108 Cal.App.4th 382, 397 [holding that under the substantial evidence test, reversal is not permitted unless "a reasonable trier of fact could have reached only one result," to wit, the result urged by the appellant].)

existing feature of the washer was defectively designed. Instead, Underwriters simply claims that "the washer: (1) was installed in a residence by a plumber; (2) was used for household laundry; and (3) overfilled and flooded the residence uncontrollably until the water supply was shut off."

By failing to specify the alleged defect in the product's design, Underwriters obscures the precise underpinnings of its theory. Our Supreme Court has "consistently held that manufacturers are not insurers of their products; they are liable in tort only when 'defects' in their products cause injury." (*Soule*, *supra*, 8 Cal.4th at p. 568, fn. 5.) In order to proceed under the consumer expectations test, there must be some showing that the product's "failure resulted *from the product's design* . . . ." (See *id.* at p. 566, italics added; see also *id.* at pp. 566–567, fn. 3 [indicating that the consumer expectations test may apply to a claim involving an automobile if, inter alia, the plaintiff "proved that [the] vehicle's design produced" the harm at issue].) Consequently, Underwriters' apparent refusal to identify the precise design defect at issue bars it from recovering on its strict products liability claim. (See also *Johnson v. United States Steel Corp.* (2015) 240 Cal.App.4th 22, 31 ["A manufacturer is . . . liable for injuries caused by a product *defect*. [Citation.] . . . 'When the injury is in no way attributable to a defect there is no basis for strict liability.' [Citation.] Strict product liability seeks to hold manufacturers . . . accountable when there is 'something wrong' with the product."].)

Notwithstanding Underwriters' failure to identify clearly the alleged design defect(s) at issue, we address two potential purported defects in design. The trial court seems to have construed Underwriters' theory under the consumer expectations

test as an implicit challenge to the design of the solenoid valve, given that "the washing machine failed because of" this part. Furthermore, Underwriters' briefing suggests it believes the washer was defective because it "lacked safety features to detect water overfill and overflow, such that an overfill or overflow would continue indefinitely until the water supply was turned off." "The critical question, in assessing the applicability of the consumer expectation test, is not whether the product, when considered in isolation, is beyond the ordinary knowledge of the consumer, but whether the product, *in the context of the facts and circumstances of its failure*, is one about which the ordinary consumers can form minimum safety expectations." (*McCabe v. American Honda Motor Co.* (2002) 100 Cal.App.4th 1111, 1124.) As we explain below, Underwriters fails to demonstrate that either theory satisfies this standard.

Regarding the malfunction of the solenoid valve, Underwriters does not contest the trial court's ruling that "the ordinary consumer has no expectation concerning how this component part would operate under the facts and circumstances of this case." Accordingly, the trial court did not err in declining to apply the consumer expectations test to determine whether the solenoid valve suffered from a design defect. (See *Los Angeles Unified School Dist.*, *supra*, 57 Cal.App.5th at p. 492 [discussing the presumption of correctness accorded to the trial court's rulings].)

Next, we address Underwriters' apparent contention that the washer should have been designed to contain "safety features to detect water overfill or overflow . . . ." *Soule* is instructive on this point. There, the plaintiff-driver's "ankles were badly injured when her . . . car collided with another vehicle. She sued

23

[the manufacturer of the vehicle], asserting that defects in her automobile allowed its left front wheel to break free, collapse rearward, and smash the floorboard into her feet." (*Soule*, *supra*, 8 Cal.4th at p. 556.) Specifically, the plaintiff asserted "the placement of the bracket [that attached the wheel assembly to the frame of the vehicle], and the configuration of the frame, were defective designs because they did not limit the wheel's rearward travel in the event the bracket should fail." (See *id.* at pp. 557–558.)

On appeal of judgment entered in the plaintiff's favor, the Supreme Court agreed with the defendant-manufacturer that the trial court erred in instructing the jury on the consumer expectations test. (See *Soule*, *supra*, 8 Cal.4th at pp. 556, 570.) The high court explained that the "[p]laintiff's theory of design defect was one of technical and mechanical detail," given that "[i]t sought to examine the precise behavior of several obscure components of her car under the complex circumstances of a particular accident." (See *id.* at p. 570.) The court found that "[a]n ordinary consumer of automobiles cannot reasonably expect that a car's frame, suspension, or interior will be designed to remain intact in any and all accidents." (*Ibid.*) The *Soule* court further remarked that "ordinary experience and understanding [would not] inform such a consumer how safely an automobile's design should perform under the esoteric circumstances of the collision at issue here," to wit, where a vehicle "received a substantial oblique blow near the left front wheel" and "the adjacent frame members and bracket assembly absorbed considerable inertial force." (See *ibid.*) *Soule* noted that "both parties assumed that quite complicated design considerations

24

were at issue, and that expert testimony was necessary to illuminate these matters." (*Ibid.*)

Here, Underwriters admits in its opening brief that "[a]lthough the subject washer contained a fill pressure switch (which detected the level of water in the washer tub) and a drain pump (which pumped the water out of the tub), neither of these features, either alone or in combination, could avert uncontrolled flooding in a machine malfunction such as occurred in this case. . . . because the subject washer was designed so that neither of these components could operate when the washer was turned off (e.g., after a wash cycle was complete)." Put differently, Underwriters' complaint is not that the washer lacked *any* sort of device capable of detecting water overfill or overflow. Rather, Underwriters faults Whirlpool for designing a washer that was unable to sense an overflow or overfill resulting from a malfunction occurring while the machine was not even in use. Indeed, to support Underwriters' claim that this omission constituted a design defect, Holden offered testimony that Whirlpool should have "include[d] in its electromechanical washing machine a device or combination of devices (including a sump pump, flow meter, alternate solenoid, audible alarm), *all with continuous power*, that would have detected the open solenoid valve and prevented the overflooding of the washing machine basin." (Italics added.)

Just as the plaintiff's theory of design defect in *Soule* was ill-suited for the consumer expectations test because it "sought to examine the precise behavior of several obscure components . . . under the complex circumstances of a particular accident" (see *Soule, supra*, 8 Cal.4th at p. 570), Underwriters' safety device theory suffers from a similar flaw. It is not apparent to us that

25

an ordinary consumer would expect a flow meter, sump pump, or some other device to detect and prevent flooding caused by an obscure component that malfunctioned while the machine was powered off.[10]

In sum, Underwriters has not shown the trial court erred in concluding that the consumer expectations test did not apply to this case.

## DISPOSITION

The judgment is affirmed. The parties are to bear their own costs on appeal.

NOT TO BE PUBLISHED.


BENDIX, J.


We concur:



ROTHSCHILD, P. J.



CHANEY, J.

---

[10] Underwriters does not contest the trial court's conclusion that the solenoid valve is "a complex and obscure part."