Filed 3/23/26  Reddy v. Unifactor Corp. CA2/1

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| PRABHAKAR REDDY, | B330750 |
| Plaintiff and Appellant, | |
| v. | (Los Angeles County Super. Ct. No. 18STCV07856) |
| UNIFACTOR CORPORATION et al., | |
| Defendants and Respondents. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Michael I. Levanas, Judge.  Affirmed.

John L. Dodd & Associates, John L. Dodd; The Ryan Law Group and Andrew T. Ryan for Plaintiff and Appellant.

Yoka│Smith, Christopher Faenza, Arpine Esmailian; Greines, Martin, Stein & Richland, David E. Hackett and Laura G. Lim for Defendants and Respondents.

————————————

# INTRODUCTION

Plaintiff Prabhakar Reddy was injured in a hotel room when a stone tabletop detached as he was attempting to move a side table. Reddy sued the hotel and settled with it prior to trial. Reddy also sued the designers and manufacturers of the table, Unifactor Corporation (Unifactor) and Steve's Plating Corporation (Steve's) (collectively, Defendants) under a theory of strict product liability for design defect, and the case against them proceeded to a jury trial.

At trial, Reddy sought to prove the existence of a design defect using both the consumer expectation test and the risk-benefit test. The trial court found no evidence to establish the consumer expectation test and granted a nonsuit as to that theory; it permitted the risk-benefit theory to go to the jury. Also during trial, Reddy sought to introduce into evidence two tables from the hotel. The court determined that neither was the table that had resulted in Reddy's injury; both had been obtained years after the injury occurred. The court found Reddy could not authenticate the tables or establish a sufficient chain of custody for them, but did permit Reddy's expert to introduce certain photographs of one of the tables taken at the time of the expert's inspection and Reddy to introduce photographs that he himself took of the table on the day of the accident.

The jury returned a special verdict in Defendants' favor, finding their product was not a substantial factor in Reddy's injury. On appeal, Reddy argues the trial court erred in granting a nonsuit on his consumer expectation theory of design defect and that such an error is reversible per se. He further argues the court prejudicially erred in excluding the two tables and that defense counsel engaged in misconduct during closing argument

by commenting that Reddy failed to bring the actual defective table to court.

We conclude that even if the court erred in granting the nonsuit, Reddy must show the error was prejudicial and he has not done so. We also hold the court did not abuse its discretion in excluding the tables, that defense counsel did not engage in misconduct, and that in any event Reddy has failed to demonstrate prejudice arising from the court's exclusion of the tables. We therefore affirm.

## BACKGROUND

### A. General Legal Principles Regarding Design Defect

We first describe the basics of the relevant design defect tests to provide context for our factual and procedural summary.

"A manufacturer . . . is liable in tort if a defect in the manufacture or design of its product causes injury while the product is being used in a reasonably foreseeable way." (*Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 560.) A plaintiff may demonstrate defective design under either or both (1) the consumer expectations test, and (2) the risk-benefit test. (*Barker v. Lull Engineering Co.* (1978) 20 Cal.3d 413, 430.) Whether the plaintiff may proceed under either test depends upon the particular facts of the case. (*Saller v. Crown Cork & Seal Co., Inc.* (2010) 187 Cal.App.4th 1220, 1233.)

"Under the consumer expectation test, a product is defective in design if it failed to perform as safely as an ordinary consumer would expect, or have a right to expect, when using the product in an intended or reasonably foreseeable manner. [Citations.] Because this test applies in cases in which jurors can evaluate a product's safety design based on 'the everyday experience of the product's users' [citation], the crucial question is

whether the circumstances of the product's failure may properly permit 'an inference that the product's design performed below the legitimate, commonly accepted minimum safety assumptions of its ordinary consumers' [citation]. [Citation.] At trial, a plaintiff proceeding under the consumer expectation test must present a prima facie case of the requisite causation and must produce evidence that the product failed to satisfy ordinary consumer expectations as to safety." (*Demara v. The Raymond Corp.* (2017) 13 Cal.App.5th 545, 557-558, italics & fn. omitted.) Expert testimony "may not be used to demonstrate what an ordinary consumer would or should expect." (*Soule v. General Motors Corp.*, *supra*, 8 Cal.4th at p. 567.)

The risk-benefit test operates differently, such as when "a complex product . . . cause[s] injury in a way that does not engage its ordinary consumers' reasonable minimum assumptions about safe performance. For example, the ordinary consumer of an automobile simply has 'no idea' how it should perform in all foreseeable situations, or how safe it should be made against all foreseeable hazards." (*Soule v. General Motors Corp.*, *supra*, 8 Cal.4th at pp. 566-567.) "Under the risk-benefit test, after the plaintiff makes a prima facie showing of causation, i.e., that the design of the product was a substantial factor in bringing about the plaintiff's injury, the burden of persuasion shifts to the defendant to establish that the benefits of the design, in light of the feasibility and costs of an alternative design, outweigh the risks of danger inherent in the design." (*Demara v. The Raymond Corp.*, *supra*, 13 Cal.App.5th at p. 562.)

"Nonetheless, the inherent complexity of the product itself is not controlling on the issue of whether the consumer expectations test applies; a complex product 'may perform so

unsafely that the defect is apparent to the common reason, experience, and understanding of its ordinary consumers.' " (*Saller v. Crown Cork & Seal Co., Inc., supra,* 187 Cal.App.4th at p. 1232.) The consumer expectations test does not preclude expert testimony on the issue of causation. (*Romaine v. Johnson Controls, Inc.* (2014) 224 Cal.App.4th 990, 1001, 1003; *Jones v. John Crane, Inc.* (2005) 132 Cal.App.4th 990, 1003.)

## B. Pre-trial Procedural Background

### 1. *The Complaint*

On October 23, 2017, Reddy was a guest in room 634 at a Los Angeles hotel (the Hotel). He moved a stone-top table that had been placed near his bed to allow him to exit the bed without bumping into it. When he pushed the table, the top detached and fell towards his feet. He stepped backwards to avoid the tabletop, fell, and hit the bed frame, injuring his spine. In December 2018, Reddy sued the Hotel for negligence and strict products liability. He later named Unifactor and Steve's as defendants.[1]

### 2. *Relevant Motions in Limine*

#### a. Reddy's Motion in Limine

Before trial, Reddy settled with the Hotel and the court dismissed the Hotel with prejudice. Reddy moved to exclude evidence from trial that he sued, settled with, and dismissed the Hotel. The court denied the motion except as to the amount of the settlement.

---

[1] Defendants cross-complained against the Hotel for indemnity and contribution.

### b. Defendants' Motion in Limine

Defendants moved to exclude from trial the introduction of two tables—which the parties referred to the "exemplar table" and the "subject table"—as well as the related testimony of Reddy's expert, Dr. Nikhil Kar—on the basis that the tables could not be authenticated. The exemplar table was, as the name suggests, a purported example of the type of table that was in Reddy's room. It was intact and consisted of a single-post metal base and a stone top affixed to the base by screws drilled through a plywood sub-top. As for the subject table, Joseph Kuhn (who testified as the Hotel's person most qualified) stated it was removed from room 634 after the Hotel received notice of the lawsuit—in other words, over one year after the accident.[2]

Kar intended to opine that the subject table had been involved in Reddy's accident, and that the exemplar table also showed signs of failure. Defendants argued that Kar could not present evidence that either table was in the same condition when he inspected them in 2022 as they had been in October 2017 when Reddy was injured, and that there was no sufficient evidence that either table was the one that injured Reddy.

Reddy opposed the motion in limine, arguing that Kuhn's testimony authenticated the evidence and that Reddy could otherwise establish a proper chain of custody.

---

[2] The Hotel's president, Andrew Hardy, declared that the subject table was removed from room 634 the day after the incident. Hardy did not testify at trial nor was he deposed. The court excluded his declaration as hearsay, and Reddy does not challenge this ruling on appeal. We therefore do not rely on Hardy's account.

6

In reply, Defendants argued that Kuhn had no personal knowledge about the source or condition of the tables as he did not start working at the Hotel until months after Reddy's accident. Defendants also reiterated that Kuhn had testified that the subject table had not been removed from room 634 until in or after December 2018.

The court deferred ruling on Defendants' motion in limine until after opening statements.

## C. Trial

### 1. *Opening Statements*

Opening statements began on March 2, 2023. Reddy stated that the Defendants "value engineered" the tables they designed and manufactured to save $9 per table. Specifically, they chose to decrease the thickness of the plywood sub-top from three-quarters of an inch to half an inch. Shortly after the Hotel purchased the tables, a different hotel guest was injured when he moved a table and the top fell off. The Hotel informed Unifactor of the accident. Unifactor advised the Hotel that using six-millimeter screws instead of four-millimeter screws would solve the problem and gave the Hotel 500 six-millimeter screws. Two years later, Reddy was injured when he pushed a table and the top broke off. Reddy told the jury it would hear evidence that his expert had inspected two tables and determined that even the six-millimeter screws demonstrated failure.

During Defendants' opening statement, they stated that the key issue was whether the design caused the tabletop to come off the base as opposed to something else. Defendants emphasized that two years had passed between the first incident and Reddy's accident, and that the fault for the accident lay with the Hotel.

7

2.    *Evidence Code Section 402 Hearing*

On March 6, 2023, the trial court held an Evidence Code section 402 hearing regarding the chain of custody for the two tables Reddy wanted to introduce.  All unspecified statutory references are to the Evidence Code.

a.    <u>Witness Testimony</u>

Reddy proffered two witnesses: Kuhn and Timothy Roy Wagner.  Kuhn began working for the Hotel in February 2018.  He was not certain when, but he believed that in the Fall of 2018, he saw a table stored in the manager's office and one in a storage room, which was locked "at different times."  He did not know how many people had access to the storage room.  Kuhn acknowledged that the Hotel's normal procedure in the event of an accident like Reddy's would be to take photographs and move the broken or unsafe furniture out of the room.  Kuhn did not personally move the tables to the office or storage room, nor did he have personal knowledge of any photographs taken at the time of Reddy's accident because he "wasn't there at the time."  There are no photographs taken by the Hotel after Reddy's accident in the record.  However, Reddy himself took photographs after the accident.

Kuhn testified that after the lawsuit was filed, the Hotel got rid of the tables except for the two that were stored.  When Kuhn saw the table in the manager's office, the top of the table was not detached from the base.

Wagner was the general manager of the Hotel between April 2019 and December 2022.  When he arrived at the Hotel, the tables were not in the manager's office or storage room.  Instead, they were kept in a shipping "container outside the Hotel for safekeeping."  The container was "sealed from the

8

outside elements." The tables were moved from the container to his office in late 2019 or early 2020. He had no personal knowledge of the tables' pre-2019 locations, "where those two tables originated," or "what, if anything, was done" to them prior to 2019. Wagner also testified that although a limited number of staff needed access to the storage room, those who had access to the room was "a grander scope of people" who had a master key. In 2022, Reddy's attorney and others came to inspect the tables, and Wagner signed a document attesting that he had possession of the tables.

b.    <u>The Court's Evidentiary Ruling</u>

Defendants argued that Kuhn's and Wagner's testimony failed to demonstrate a sufficient chain of custody. The court agreed Reddy failed to establish a chain of custody for the two tables and ordered the tables excluded. It explained that the parties could use photographs instead. Those included the photographs Reddy took the evening of the accident and certain photographs that Kar took of the exemplar table when he inspected it in 2022.

c.    <u>Defendants' Request for a Nonsuit</u>

During the section 402 hearing, Defendants argued that the court should grant a nonsuit because there was no evidence of causation "other than the plaintiff touching" the table. Reddy responded that he could prove a design defect under the consumer expectation test through circumstantial evidence. He also argued that he could prove causation, and that it was Defendants' burden and not his to prove comparative fault of a third party.

The court deferred ruling on the nonsuit motion.

9

3.   *Trial Evidence*

a.   <u>Katherine Knezevich</u>

Reddy called Katherine Knezevich pursuant to section 776. In 2015, she was "in charge of" Unifactor, which made custom furniture for the hospitality industry. Steve's was Unifactor's "sister company." Katherine's cousin, Terry Knezevich,[3] had owned both companies. Terry's father started Steve's in the 1950s, and Terry took over in the 1960s and created Unifactor in 1972. Katherine began working for Defendants in 1993. Steve's did not employ any engineers, although Katherine "viewed" Terry as one.

An interior design firm approached Katherine with the table project and provided a design sketch along with information about the desired table dimensions and materials. "[T]here was some discussion about value engineering th[e] table," and Unifactor suggested the plywood sub-top be decreased from three-quarters of an inch to one-half inch. This change saved the Hotel $9 per table. Each table had to be able to support 250 pounds. Defendants provided a prototype to the Hotel, and in December 2014, the Hotel approved Unifactor's final design.

Defendants tested the weight load of their table design by having an employee who weighed more than 250 pounds sit on top of one and "move[] around." That test lasted approximately 10 or 20 minutes. Defendants did not flip over the table to ensure the base was secured to the top. No engineer examined the table to see if it was safely designed.

---

[3] Because they share a surname, we refer to Katherine and Terry by their first names. No disrespect is intended.

10

In early 2015, Defendants shipped 127 tables to the Hotel. The purchase order reiterated the tables had to support 250 pounds and be "suitable for heavy commercial use."

In July 2015, the Hotel notified Katherine that the top of one of the tables had dislodged, injuring a guest. By email, Kevin Reynolds (a project manager for the Hotel's renovations in 2014 and 2015) explained, "With little effort, I was able to dislodge the base from the plywood substrate glued . . . to the stone top. I think the plywood is not thick enough for the screws to be able to grab onto the plywood. I think the plywood needs to be thicker. . . . Perhaps a solution would be to adhere another layer of plywood to the existing [one]? Pl[ea]s[e] discuss with manufacturer and offer a solution. This is a safety/injury issue . . . ."

Defendants determined that replacing the four-millimeter wood screws that adhered the top to the base with six-millimeter screws would solve the problem. On July 29, 2015, Defendants sent an employee to the Hotel to fix the tables. The employee provided oral instructions while demonstrating the repair. The Hotel did not ask Unifactor to carry out the repairs, so Unifactor left over 500 six-millimeter screws with the Hotel for it to complete the repairs. Unifactor had not tested whether the heavier screws would hold the table together.

On September 11, 2015, the Hotel requested written instructions for the repair, which Katherine provided. She sent another 500 six-millimeter screws to the Hotel.

Katherine agreed that moving the table should not cause the top to fall off and that "the person moving the table wouldn't expect that to happen." Moving the table was "not a product misuse."

11

On cross-examination, Katherine testified that once Unifactor delivered a product, it no longer had control of it. She expected that the Hotel would ensure the product was safe for their guests. The Hotel never contacted Unifactor after Reddy's accident, and Katherine learned of the accident after Unifactor was served with the complaint.

When the Hotel and Katherine discussed value engineering, she suggested that they change the base or the stone top, but the Hotel rejected those options. She therefore suggested decreasing the thickness of the plywood. Although thicker plywood would provide more grip for the screws, she believed one-half inch of plywood still provided a safe option. She would not have sold a product that she thought was unsafe.

Katherine was not aware of any industry standard that stated using one-half inch of plywood was insufficient for six-millimeter wood screws. Rather, doing so was consistent with her 30 years' experience. She did not know whether the four-millimeter screws were the reason that the table failed in 2015 or why the table broke during Reddy's accident. She further testified that screw holes are pre-drilled so that the wood does not split and that the repair instructions for the tables involved replacing the four-millimeter screws with six-millimeter screws, not drilling new holes. After the 2015 incident, the Hotel ordered two more tables in 2016.

b.     Kevin Reynolds

In July 2015 (more than two years before Reddy's accident), Reynolds was asked to look at a side table in one of the guest rooms. He "flipped it upside down so the top of the side table was on the carpet[ a]nd . . . the base was up in the air. And with [his] hands, [he] grabbed the base and exerted some . . . force and was

12

able to dislodge the base." Reynolds did not recall if he had tested the table in its normal position and agreed he would not expect a guest to turn over the table. He did so to see if he could get the tabletop loose because he had been told it happened to someone else. He agreed that the Hotel was responsible for managing the rooms and that it was fair to expect housekeeping to move the furniture to its proper place in the room. Reynolds said that by September 2015, the Hotel had not repaired the tables and had lost the screws. After September 2015, he did not learn of any further problems with the tables until after the lawsuit was filed.

### c. Reddy

Reddy testified that on October 23, 2017, he stayed at the Hotel. That evening, he decided to move the side table because it was too close to the bed. He pushed the table away from the bed and closer to a lounge chair. He thought the table was a "reasonable weight" "for that type of table" and he used "reasonable pressure to move" it. "[A]s soon as [he] started moving it, the table top slid, the top came off, and then it started falling towards [his] feet. So then [he] knew that it was going to fall on [his] feet, so [he] tried to step away and [he] lost balance and fell backwards onto the floor." He hit the bed frame with his back. Soon after he fell, he called the front desk and asked to be taken to the hospital. He did not believe that anything he did was the reason the table fell apart.

Reddy photographed the broken table and pieces of wood on the lounge chair. Six such photographs were admitted into evidence. The photographs depicted a metal base with four screw holes. One hole was empty; three screws were in the others and had pieces of wood attached to them.

13

After the accident, Reddy learned he had fractured his vertebra. At the time of his testimony, he remained in pain from the injury.

Reddy testified he settled with the Hotel in June 2022.

On cross-examination, Reddy agreed that a hotel guest should not have to move a table and that the table was not in the right place. Reddy blamed the Hotel and the table not being strong enough to sustain the force he applied to it without falling apart. He did not know how many people had had access to the table in the two years since Defendants had delivered the table to the Hotel. When asked, "Do you believe that [Unifactor] is responsible simply because the table top fell off and [Unifactor] manufactured it two and a half years earlier?" Reddy responded, "Yes."

### 4.     *Nonsuit Hearings*

Following the above testimony, the court heard the nonsuit motion. Defendants argued there was no evidence to prove the design was a substantial factor in causing the failure. They also argued that Reddy's theory of why the table failed (namely, the inadequacy of the plywood and screws) was not related to "typical" consumer expectations within the jury's commonsense understanding.

Reddy argued that based on the photographs he took after the incident, the screws did not hold in the wood and that this evidence was sufficient for the jury to find the defect caused the failure. The court asked what testing Kar had done to determine that the tables could not withstand 250 pounds. Reddy responded that Kar observed evidence of wood splintering when he unscrewed the six-millimeter screws from the exemplar table. Separately, Kar observed a gap between the metal base and the

14

wood of the exemplar table, indicating the table had started to fall apart.

The court stated that for the consumer expectations test to go to the jury, the table had to be the kind of product about which the ordinary consumer had reasonable minimum safety expectations. Finding that was not the case, the court granted a nonsuit as to the consumer expectation test.

The court later conducted a further hearing to assess the nonsuit request as to the risk-benefit test and whether Kar's testimony could refer to the exemplar table. The court ruled that Kar could testify regarding his inspection of the exemplar table and denied the motion for nonsuit as to the risk-benefit theory. The court did not permit Kar to rely on any observations of the so-called "subject table" as there was insufficient evidentiary support that it was in fact the table involved in Reddy's injury and in the same condition it was at the time of the accident. However, the court permitted Kar to rely on photographs he took of the exemplar table and his observations concerning it, as well as Reddy's photographs, when testifying about his expert opinions.

5. *Resumed Trial Evidence*

Before the jury, Kar testified that he inspected an exemplar table from the Hotel in 2022. The table weighed approximately 57 pounds, with the top weighing about 33 pounds and the bottom weighing about 25 pounds. He observed "separation and a gap between the base and the sub[-]top . . . a gap between a screw and that piece of wood." Reddy showed photographs of the separation to the jury during Kar's testimony.

Kar also testified that Reddy's photographs showed three screws in the baseplate of the table with wood remnants attached

to them. Kar described that a single column table like the one at issue needed to be able to support off-axis loads. Having a heavyset employee sit on the table failed to test the adequacy of the joint between the base and the sub-top for off-axis loads of 250 pounds. Kar opined the table was not safely designed because the length of the screws and the thickness of the sub-top were inadequate. He also testified that industry standards required that products be designed and manufactured to last 10 years.

Kar could not conduct load testing on a table from the Hotel. Such testing was destructive and he could not properly test the table seven years after its manufacture. He denied that he could build a sample on which to conduct tests because it would not exactly replicate Defendants' product. For example, Kar did not have access to the same plywood supplier or sheet metal manufacturer as Defendants. He agreed that at the time Defendants manufactured the table, it could have sustained 250 pounds. Kar could not tell from the presence of wood on the screws he examined how much force it took to rip the screws out. Kar estimated that Reddy exerted about 94 pounds of force on the table.

6. *Jury Instructions and Special Verdict Form*

The court instructed the jury as to the definition of a substantial factor in causing harm using CACI No. 430.

The court also instructed on the elements of strict liability for design defect under the risk-benefit test, stating that Reddy had to prove that (1) Defendants manufactured, distributed, or sold the table, (2) Reddy was harmed, and (3) the table's design was a substantial factor in causing harm to Reddy. The instruction stated that if Reddy proved those facts, then the jury

16

was to find in Reddy's favor unless Defendants proved the benefits of the table's design outweighed the risks. (CACI No. 1204.)

The special verdict form was consistent with CACI No. 1204, asking, (1) "Did [Defendants] manufacture and/or sell the . . . table," (2) "Was the . . . table's design a substantial factor in causing harm to . . . Reddy," and (3) "Did the benefits of the . . . table's design outweigh the risks of the design?" Based on the jury's answer to each question, the verdict form directed the jury whether to proceed to the next question or stop and go no further.

The court also instructed the jury as to the affirmative defense that third-party conduct was a superseding cause, comparative liability, and that the jury was not to deduct any amount from Reddy's damages because he settled with the Hotel because the court would carry out any such deduction.

7. *Closing Arguments*

a. Reddy's Closing Argument

Reddy argued it was undisputed that Defendants designed and manufactured the product and that their table harmed him. He explained the jury also had to determine whether the table's design was a substantial factor in causing harm to Reddy and that, "If those three answers are yes, then you evaluate did the table's design have any benefit compared to the risks imposed?" Reddy argued Kar testified the screws were insufficient to hold the table together and that the joint was inherently weak.

Reddy also argued the Hotel was obligated to keep things safe and said that was why the Hotel settled with Reddy. Defendants objected, and the court told Reddy to "move on." Reddy then stated the Hotel was "in this case, and they're out of this case after we realized who was at fault." Defendants

17

objected and requested a sidebar.  In chambers, Defendants requested "a mistrial or the opportunity to tell the jury that [Reddy] received [$]1.3 million."  The court stated that Reddy's argument intimated that Reddy had "settled with [the Hotel] to get them out of the case for nothing.  That's inappropriate." Reddy's counsel stated, "If you want to bring in the numbers, that's fine."  The court responded that doing so would resolve the issue.

When Reddy's closing argument resumed, his counsel stated, "[W]e agreed to let you know the amount of the settlement . . . .  It was $1.3 million with the Hotel defendants." He argued that Defendants failed to present evidence of the Hotel's negligence.

b. <u>Defendants' Closing Argument</u>

Defendants argued that Reddy failed to obtain evidence from the Hotel of the actual broken table.  Defendants' counsel stated, "[I]f you're going to bring a case against product defect, bring the product in the courtroom.  Otherwise, don't bring the case."  Counsel also stated that Reddy had not backed up his promise in opening statement to provide certain evidence about the tables inspected by his expert.  Reddy objected, arguing, "This is the same issue we talked about with the settlement."  The court overruled the objection.

Defendants argued the table did not fail because of anything they did.  Defendants also argued that Kar's testimony was not credible.  Defendants further argued that the Hotel was responsible because they put the product too close to Reddy's bed, and in the 700 to 800 nights that the table was within the exclusive control of the Hotel, "[s]ome forces acted upon that table to make it loose."  Defendants emphasized, "So this will be

18

the question, substantial factor," and that Reddy "can't prove that the design was a substantial factor because you don't know what broke it." "Meaning was how it was built, is that what caused this thing to fail? Of course the answer is no." "You can't tell what caused it, so it's impossible for you to find for the plaintiff because you would be guessing." Defense counsel then described the next question on the verdict form about whether the benefits of the design outweighed the risks and noted he did not think the jury would reach that question.

> c. <u>Reddy Requests to Bring in the Exemplar Table</u>

During the lunch break, Reddy argued, "Defense counsel mentioned that we haven't had the table here, but the table is in your office. Can we at least show the exemplar table that Dr. Kar tested? I think it's fair because he raised that we don't have it, and we clearly do. We won't call it the subject table." The court responded, "I ruled it was not to be used by you and use the photograph." Reddy did not request the court provide any admonition. Thereafter, Defendants continued their closing argument.

> 8. *Verdict and Judgment*

Less than an hour after retiring for deliberations, the jury reached a verdict. In their special verdict, the jury unanimously found Unifactor and/or Steve's manufactured or sold the table. The jury found, nine-to-three, that the table's design was not a substantial factor in causing harm to Reddy. As directed, the jury did not answer the remaining questions on the verdict form.

## DISCUSSION

Reddy argues the trial court erred in two respects: (1) granting nonsuit as to the consumer expectations test and

19

(2) excluding the so-called "subject table" and "exemplar table" from trial, especially after Defendants' counsel purportedly committed misconduct by arguing Reddy failed to produce evidence of the table that actually injured Reddy.

## A. The Trial Court Did Not Prejudicially Err in Granting Nonsuit

A defendant is entitled to a nonsuit if the evidence is insufficient to permit a jury to find in the plaintiff's favor.  (*Nally v. Grace Community Church* (1988) 47 Cal.3d 278, 291.)  " 'In determining whether [the] plaintiff's evidence is sufficient, the court may not weigh the evidence or consider the credibility of witnesses.  Instead, the evidence most favorable to [the] plaintiff must be accepted as true and conflicting evidence must be disregarded. . . .' [Citation.]  A mere 'scintilla of evidence' does not create a conflict for the jury's resolution; 'there must be substantial evidence to create the necessary conflict.' " (*Ibid.*, italics omitted.)

We need not resolve whether Reddy's evidence was sufficient to permit a finding in his favor of a design defect based on the consumer expectation test because, assuming for the sake of argument the trial court erred in granting a nonsuit on that theory, the error was harmless.

"A judgment may not be reversed on appeal . . . unless 'after an examination of the entire cause, including the evidence,' it appears the error caused a 'miscarriage of justice.'  (Cal. Const., art. VI, § 13.)  When the error is one of state law only, it generally does not warrant reversal unless there is a reasonable probability that in the absence of the error, a result more favorable to the appealing party would have been reached.  (*People v. Watson*

(1956) 46 Cal.2d 818, 835 . . . .)" (*Soule v. General Motors Corp.*, *supra*, 8 Cal.4th at p. 574; see also Code Civ. Proc., § 475.)

Reddy makes the conclusory assertion that an erroneous grant of nonsuit is reversible per se because it "denies the plaintiff his right to a jury trial." That is incorrect. "There are few types of error which are categorically reversible or reversible per se." (*Paterno v. State of California* (1999) 74 Cal.App.4th 68, 105.) Rather, whether there has been a miscarriage of justice " 'depends upon each particular case as it arises.' " (*Ibid*.) "[E]rror in eliminating a legal theory from a [civil] case is not categorically reversible." (*Id*. at p. 107; see *Soule v. General Motors Corp.*, *supra*, 8 Cal.4th at p. 579.)

"Because of the need to consider the particulars of the given case, rather than the type of error, the appellant bears the duty of spelling out in his brief exactly how the error caused a miscarriage of justice." (*Paterno v. State of California*, *supra*, 74 Cal.App.4th at p. 106.) Reddy fails to do so. He explicates no evidentiary basis for prejudice, and none of the legal authority he cites on that point involves a nonsuit. Rather, they involve the inapposite situation of trial courts acting in excess of their jurisdiction by proceeding with a bench trial after a party properly requested a jury trial. (E.g., *Brown v. Mortensen* (2019) 30 Cal.App.5th 931, 938; *Valley Crest Landscape Development, Inc. v. Mission Pools of Escondido, Inc.* (2015) 238 Cal.App.4th 468, 493.)

Multiple cases demonstrate that an erroneous grant of nonsuit does not require reversal without demonstrated prejudice. For example, in *Cantor v. County of Santa Clara* (1956) 139 Cal.App.2d 441, the plaintiff sued a county and a county commissioner after an auto accident. (*Id*. at pp. 444-445.)

21

The trial court granted nonsuit in favor of the commissioner based on his defense that no funds were available for road repair. (*Id*. at p. 448.) A jury later found that the county was not negligent. The plaintiff argued and the appellate court agreed that the nonsuit was erroneous because there was some evidence of available funds. (*Id*. at pp. 448-449.) However, the appellate court did not reverse, stating, "The most serious question is whether the error in granting the nonsuit is not error without prejudice due to the finding of the jury in favor of the county" on the plaintiff's negligence claim. (*Id*. at p. 450.) It held that the plaintiff's primary proof against the county was the commissioner's alleged negligence. (*Id*. at p. 451.) Because the jury found the county was not negligent, then "necessarily the agent whose very acts were in question is released from the charge of negligence." (*Ibid*.)

In *Lussier v. San Lorenzo Valley Water Dist.* (1988) 206 Cal.App.3d 92, the plaintiffs sued a water district for negligence, nuisance, and trespass when debris from the district's land washed onto the plaintiffs' land and caused damage. (*Id*. at pp. 97-98.) The trial court granted nonsuit to the district as to the claims for nuisance and trespass based on immunity. A jury found in the district's favor on the plaintiffs' negligence claim. The appellate court found the nonsuit on the nuisance and trespass claims was error, but "since the [d]istrict's liability for creating a nuisance [or for trespass] could only have arisen from its alleged negligence, and since the jury found that the [d]istrict was not negligent, any error in granting nonsuit on th[ese] claim[s] was harmless." (*Id*. at p. 106.)

In *Piedra v. Dugan* (2004) 123 Cal.App.4th 1483, a minor patient's parents sued a doctor for negligent failure to obtain

informed consent and battery based on a lack of consent to certain medical procedures. (*Id*. at pp. 1485, 1495-1496.) The trial court granted nonsuit on the battery claim. (*Id*. at p. 1495.) A jury later returned a special verdict in which it found with respect to the negligent failure to obtain informed consent claim that the doctor provided all relevant information to the parents to enable them to make an informed decision. (*Id*. at p. 1500.) The appellate court held that the jury's finding rendered any error in granting the nonsuit harmless because the battery claim depended on a showing of lack of consent. (*Ibid*.)

As these examples demonstrate, courts will not reverse the grant of nonsuit where there is no prejudice because the jury concluded the plaintiff had not proven an essential element of the excluded theory of liability. The same holds true here. Causation was an essential element of both the risk-benefit test and the consumer expectation test. (Compare CACI No. 1204 [risk-benefit test] with CACI No. 1203 [consumer expectation test].) The jury's no causation finding therefore would have precluded a verdict in Reddy's favor under the consumer expectation test even if that theory had gone to the jury. Thus, like *Cantor*, *Lussier*, and *Piedra*, even if the court erred in granting nonsuit, any such error was harmless as the jury's verdict demonstrated Reddy did not prove an essential component of the excluded theory.

In his reply brief, Reddy suggests for the first time that it is unclear whether the jury found a lack of causation because of an alleged jury instruction ambiguity. Reddy's opening brief did not challenge the substantial factor jury instruction or the jury's finding; any such argument made only in reply is forfeited. (*Doe v. California Dept. of Justice* (2009) 173 Cal.App.4th 1095, 1115.)

23

Even if this issue was not forfeited, Reddy does not cite any law or facts from the record to support his claim that the jury misunderstood the jury instructions. " 'The crucial assumption underlying our constitutional system of trial by jury is that jurors generally understand and faithfully follow instructions' " (*People v. Barber* (2020) 55 Cal.App.5th 787, 799), and Reddy offers no reason to question that assumption or that the standard CACI instructions used by the court were unclear. Defendants' primary defense was that Reddy could not prove causation, and defense counsel took the jury through the verdict form during the closing argument on that very topic. We therefore fail to perceive the alleged uncertainty that Reddy claims.

Because Reddy failed to establish a causal link between the design and his injury, he has not demonstrated a reasonable probability that if the consumer expectation test had been put before the jury, he would have obtained a more favorable result. (See *Soule v. General Motors Corp.*, *supra*, 8 Cal.4th at p. 574, citing *People v. Watson*, *supra*, 46 Cal.2d at p. 835.)

## B. The Trial Court's Evidentiary Ruling Was Not an Abuse of Discretion, Nor Did Defendants' Counsel Engage in Prejudicial Misconduct

### 1. *General Legal Principles and Standard of Review*

" 'In a chain of custody claim, " [t]he burden on the party offering the evidence is to show to the satisfaction of the trial court that, taking all the circumstances into account including the ease or difficulty with which the particular evidence could have been altered, it is reasonably certain that there was no alteration. [¶] The requirement of reasonable certainty is not met when some vital link in the chain of possession is not accounted for, because then it is as likely as not that the evidence

24

analyzed was not the evidence originally received. Left to such speculation the court must exclude the evidence. [Citations.] Conversely, when it is the barest speculation that there was tampering, it is proper to admit the evidence and let what doubt remains go to its weight.' " ' " (*Bader v. Johnson & Johnson* (2022) 86 Cal.App.5th 1094, 1114.)

We review evidentiary rulings for an abuse of discretion. (*Poniktera v. Seiler* (2010) 181 Cal.App.4th 121, 142.) "The court's ' "discretion is only abused where there is a clear showing [it] exceeded the bounds of reason, all of the circumstances being considered." ' [Citation.] However, even where a trial court improperly excludes evidence, the error does not require reversal of the judgment unless such error resulted in a miscarriage of justice. [Citation.] [The appellant] has the burden to demonstrate it is reasonably probable a more favorable result would have been reached absent the error." (*Ibid*.)

2.    *Analysis*

Reddy argues the court erred in excluding the exemplar and subject tables. Reddy contends the subject table is the one that broke on the night of Reddy's accident, and that the exemplar table was substantially similar to it. Reddy further argues that Defendants' counsel compounded the prejudice to Reddy from this evidentiary error and engaged in misconduct by faulting Reddy for failing to present the table that injured him to the jury when counsel had successfully excluded it from trial.

The trial court did not abuse its discretion in deciding that Reddy failed to provide sufficient evidence demonstrating that the subject table was the table involved in Reddy's accident or if so, that it was in substantially the same condition as it had been directly after Reddy's accident. The witnesses that Reddy offered

25

during the section 402 hearing, Kuhn and Wagner, began their employment with the Hotel four to 18 months after Reddy's accident and had no personal knowledge of what happened to the table involved in Reddy's accident.  As the Hotel knew the table which injured Reddy was broken after this accident, it stands to reason that the table in room 634 when the lawsuit was filed in December 2018, over a year later—which is when Kuhn testified he had the subject table removed from that room—was not the table involved in Reddy's accident, or was repaired and continued to be used and, thus, was not preserved in the same condition it had been in at the time of Reddy's accident.  Further, in the years after a table was removed from room 634, that table had been stored in the manager's office or storage room and then moved to a shipping container, and then moved back to the manager's office.  The testimony established that during those years, others had access to the table and there was no testimony of efforts to maintain the table so that its condition was not altered.  Accordingly, the trial court's ruling excluding the subject table from the courtroom did not exceed the bounds of reason.

As for the exemplar table, the court permitted the introduction of photographs that explained Kar's analysis of that table.  Reddy fails to explain why the introduction of the exemplar table itself in those circumstances would not be cumulative.  Even if he had provided an explanation, the same questions existed about the chain of custody as to the exemplar table as they did for the subject table, as it was stored for a lengthy period of time in multiple locations where unknown individuals had access to it.  In addition, introducing the exemplar table into evidence would have invited jurors to conduct their own inspection during deliberations despite evidence that

26

Kar removed the screws from the table during his investigation and, thus, the table was not in the same condition as it was when Kar first examined it.

The photographs taken during Kar's 2022 inspection of the exemplar table were, thus, far more probative, and the court permitted Kar to provide those photographs to the jury and to describe his theory of defect using those photographs. The jury also had the photographs that Reddy himself took after the accident of the actual table involved in his accident. Thus, the jury had adequate visual representations of any relevant tables. Reddy does not explain how having the so-called subject table or the exemplar table physically before the jury would have changed the result.

Reddy also argues that defense counsel's following statements in closing argument compounded the prejudice from the court's error and constituted misconduct warranting reversal: (1) "[I]f you're going to bring a case against product defect, bring the product in the courtroom. Otherwise, don't bring the case"; (2) "Clearly, we didn't have a table"; and (3) there was no evidence "they inspected [the] two tables in the case."

Reddy cites *Jackson v. Park* (2021) 66 Cal.App.5th 1196 for the proposition that "[i]t is misconduct 'to assert or imply facts not in evidence that counsel knows could be refuted by evidence the court has excluded.'" (*Id*. at p. 1199.) Counsel in *Jackson* made knowingly false claims that the evidence at issue did not exist when it in fact did. (*Id*. at p. 1217.) That was undoubtedly misconduct. (E.g., Cal. Civ. Ctrm. Hbook. & Desktop Ref. (2025 ed.) § 30:22.) That is not what occurred here. It is misconduct to falsely represent a lack of evidence when the evidence exists. But it is entirely appropriate for an advocate to point out a lack of

evidence when there *is* a lack of evidence.  Here, defense counsel's first and second comments of which Reddy complains did not misrepresent the state of the evidence.  The trial court did not exclude from evidence the table that injured Reddy; it ruled there was no reliable evidence that that table still existed.

As to the third comment, the full context of that statement is as follows: "This is what was told to you in [Reddy's] opening [statement].  And these are promises.  The evidence will show they inspected two tables in the case.  There was no evidence of that.  That's what he told you would happen.  The [H]otel kept two tables.  You didn't hear any evidence of that."  Reddy does not cite any authority or provide cogent argument that it is improper for counsel to truthfully tell the jury that the other party failed to adduce evidence referred to during opening statement.  Nor does Reddy demonstrate how such a comment is prejudicial.

## DISPOSITION

We affirm the judgment.  Defendants are awarded their costs on appeal.

NOT TO BE PUBLISHED

WEINGART, J.

We concur:

BENDIX, Acting P. J.          M. KIM, J.

28